MARSHALL D. LEMMON, Appellant, v. CONTINENTAL CASUALTY COMPANY, Respondent.—No. 38155.—169 S. W. (2d) 920.

Division One, February 2, 1943.

Rehearing Denied, March 2, 1943.

Motion to Transfer to Banc Overruled, April 6, 1943.

*Scarritt, Jones & Gordon* for appellant.

*Henry M. Shughart, Harry P. Thomson, Jr.,* and *Walter A. Raymond* for respondent.

BRADLEY, C.—Action to recover on an accident insurance policy; verdict and judgment went for defendant and plaintiff appealed.

The policy was issued to Roscoe A. Kelly, August 10, 1914, and insured's wife was beneficiary at time of his death. After his death the policy was assigned to plaintiff. Judgment was asked for $7500, with interest, and also for attorney's fees, etc., for alleged vexatious refusal to pay. Sec. 6040, R. S. 1939, Mo. R. S. A., Sec. 6040. The amount in dispute gives the supreme court jurisdiction of the appeal. Art. 6, Sec. 12, Constitution; Sec. 2078, R. S. 1939, Mo. R. S. A. 2078; Rodgers v. Travelers' Ins. Co., 311 Mo. 249, 278 S. W. 368.

It is conceded that the insured committed suicide, and intentional suicide, while sane, is not an accident, but suicide while insane is an accident. Aufrichtig v. Columbian National Life Ins. Co., 298 Mo. 1, 249 S. W. 912; Scales v. National Life & Accident Ins. Co., (Mo. Sup.), 212 S. W. 8; Andrus v. Business Men's Accident Assn., 283 Mo. 442, 223 S. W. 70, 13 A. L. R. 779; Brunswick v. Standard Accident Ins. Co., 278 Mo. 154, 213 S. W. 45, 7 A. L. R. 1213. The defense was intentional suicide while sane.

Error is assigned (1) on alleged conflict between plaintiff's instruction No. 2 and defendant's instruction D; and (2) that defendant's instructions C and D unduly emphasize that the burden of proof was on plaintiff.

Defendant, respondent here, makes the point that plaintiff, appellant here, is not entitled to have this court pass on alleged errors in the instructions, for the reason plaintiff "did not have all the evidence included in the bill of exceptions, and this, notwithstanding defendant has always contended its demurrer to the evidence should have been sustained."

It appears from what defendant terms "an additional abstract of the record" that, at the time plaintiff submitted the bill of exceptions to the trial court for allowance and filing, defendant appeared and made objection on the alleged ground that the bill did not contain all the evidence, and defendant preserved the proceedings had upon the objection in what is called respondent's "term bill of exceptions." Plaintiff says that the additional abstract is not proper because the law "authorizes a bill of exceptions only on behalf of an appellant." Without ruling plaintiff's point that the additional abstract is unauthorized, we nevertheless consider its contents because both sides agree, in effect, in the briefs, that the additional abstract contains what occurred on the hearing of defendant's objection to filing and allowance.

In the additional abstract it appears that on the occasion of the presentation of the bill of exceptions for filing and allowance, Mr. Jones, counsel for plaintiff, said: "We are reputable members of the bar and the court knows it, and we state that the only proposition we are going to present to the supreme court is the matter upon the instructions."

Rule 6 of this court provides: "To enable this court to review the action of the trial court in giving and refusing instructions it shall not be necessary to set out the evidence in the bill of exceptions; but it shall be sufficient to state that there was evidence tending to prove the particular fact or facts. If the parties disagree as to what fact or facts the evidence tends to prove, then the testimony of the witnesses shall be stated in narrative form, avoiding repetition and omitting immaterial matter."

Instead of securing, for the preparation of the bill of exceptions, a complete transcript of the evidence from the court reporter, plaintiff, for the evidence of all the witnesses, except two, inserted in the bill of exceptions, a statement in narrative form taken from the notes and papers in counsel's file. The evidence of the insured's son, William Kelly, and plaintiff's only expert witness, Dr. Harrington, in the bill of exceptions, was from the transcript of the reporter, and so appears in the abstract. There is no statute, ruling or rule, so far as we know, that requires an appellant, in making up the

bill of exceptions, to insert, for the evidence, a transcript of the reporter. For an equity case, see our rule 7.

To support the contention that plaintiff is not entitled to have the assigned errors ruled on the merits, for the reason claimed, defendant cites: State ex rel. Chicago, R. I. & Pac. Ry. Co. v. Shain et al., 338 Mo. 217, 89 S. W. (2d) 654, l. c. 656; Klene v. St. Louis-San Francisco Ry. Co., 321 Mo. 162, 9 S. W. (2d) 950, l. c. 952; Manthey v. Kellerman Contracting Co., 311 Mo. 147, 277 S. W. 927, l. c. 930; Bedsaul v. Feeback et al., 341 Mo. 50, 106 S. W. (2d) 431, l. c. 432; Fears v. Newman Mercantile Co. et al., 348 Mo. 1102, 156 S. W. (2d) 909, l. c. 911.

In State ex rel. v. Shain et al., supra, the sufficiency of the evidence was questioned, as well as instructions, as in the present case, but the bill of exceptions involved did not contain any evidence at all. The bill merely recited that "plaintiffs introduced testimony tending to prove all the allegations of their petition. Defendant introduced testimony tending to prove all the allegations of the answer." The same situation as to the bill of exceptions and questions raised, prevailed in the Klene case, supra, as did in State ex rel. v. Shain et al. Such question as presented in the present case was not involved in the Manthey case, supra. In the Bedsaul case, supra, the plaintiff appealed, and the sufficiency of the evidence and instructions were involved, as in the present case. The bill of exceptions did not set out any evidence, but recited that plaintiff's evidence tended "to prove each and every allegation set forth" in the petition, and that defendants "introduced evidence tending to support each and every allegation set forth in the answer." In that case defendants endorsed on the bill of exceptions before its filing, their agreement that it was "true and correct." It was held that defendants were bound by the agreement. In the Fears case, supra, the appeal was dismissed because the appellant (the plaintiff) violated rule 13 in failing to bring up in the abstract the necessary evidence "to a complete understanding of all the questions presented for decision."

Rule 13 is on the subject of what abstracts of the record shall contain, and among the requirements is that "said abstract shall set forth so much of the record as is necessary to a complete understanding of all the questions presented for decision." If rule 13 is complied with, a hearing on the merits should not be denied. To do so would thwart and not promote justice. The evidence brought up in plaintiff's abstract of the record in the present case, is amply sufficient to enable the court to understand "all the questions presented for decision", which of course, includes the question on defendant's demurrer to the evidence, and defendant's complaint on the bill of exceptions is overruled.

 Did plaintiff make a submissible case? If not, then the instructions are out of the picture. Wallace v. Herman Body Co., 349 Mo. 1093, 163 S. W. (2d) 923.

The point on the demurrer to the evidence is whether plaintiff made a submissible case on the question as to whether the insured was insane when he committed suicide. Insured's son, his widow, and others were witnesses for plaintiff. It will not be necessary to set out the evidence of these witnesses. Their evidence is summarized in a hypothetical question submitted to Dr. G. Leonard Harrington, a graduate of the University of Kansas, and who had post graduate work in psychiatry, and three years in an institute of psychoanalysis in Chicago; was a member of the Kansas City and Jackson County Medical Associations, and a member of the Association of American Psychiatrists, and on the faculty of the University of Kansas Medical. Dr. Harrington had no acquaintance with the insured, ''just met him, that is all.'' The hypothesized facts, in substance, follow:

The insured was 50 years old, married, lived with his wife and son, age 23; had great affection for them; his domestic life was a happy one; had been employed by a large grain company for 27 years; received a comfortable income and in the latter years received near $500 per month; from 1915 he held a membership in the Kansas City Board of Trade; was well liked by his fellow members; became a member of the board of directors and served on important committees of the board, and became vice president; was an active, aggressive business man, quick in decision, mentally alert, had great confidence in his own judgment; was pleasant, enjoyed social and business friends; entertained at his home, was considered a fine host, good conversationalist; kept himself well groomed, was erect in carriage, took active interest in golf, football, baseball, basketball; in 1931, he became a member of the Catholic Church and until his death was a devout member; he received instruction in the doctrines of the church, among which was the doctrine that suicide while sane lost ''all church benefits, the refusal of a Catholic burial, and also would assure eternal damnation''; in August, 1938, trouble arose in the local office of the grain company for whom insured worked and the manager was let out; insured was placed in charge for a few weeks and entered vigorously upon the discharge of his duties as manager and seemed enthusiastic about his promotion; in early October, 1938, another was made manager, and shortly thereafter, insured was discharged.

Shortly after discharge he became a cash grain broker, but from the day of discharge until his death, a great change came over him; he became progressively despondent, melancholy, depressed, morose, downhearted; isolated himself from business associates, social friends, and family; frequently seemed to be in a daze and would stare for great lengths; look as if in a stupor; would frequently gaze at the blackboard on the floor of the Board of Trade ''for a long time without making any visible sign of life except simply to remain standing''; if spoken to at Board of Trade ''his answers would indicate that he

had no desire to converse"; his friends, on occasions, would extend greetings "and frequently he was in such a daze that he would apparently not appear to recognize them or even see them"; he appeared to lose confidence in his own judgment; seemed afraid to make decisions, and when he made decisions was slow in doing so; said that his mind "did not seem to click"; was confused and greatly worried; at home he refused to discuss business, was stubborn and silent when business matters were mentioned; isolated himelf, would not freely talk with his wife and son, was melancholy and depressed, nothing· seemed to amuse him; he became irritable; lost interest in sports; "would prefer to sit in a corner (at home) and not take any interest in what was going on about him"; he "also read much" a book or magazine called Your Life, which "dealt with mental problems, such as analyzing your own mind and your emotions"; would stay up late at night; arise early, "moan and toss in his bed"; became careless and untidy in dress; walked with his face down, stooped; seemed "to drag his feet"; two days before his death he was informed that he was to be employed by a grain company, salary at start $300 per month, plus bonus, and would start about October 1st, and that his work would be similar to that with his former employer; he seemed much pleased at the prospect of the new employment, but did not tell his family about it; on "the evening before his death he became short with his son over the receipt of a letter that had been addressed to his son; that when his son returned home that same evening from law school, which was the first night of the law school, he evinced no interest in his son or in the studies which his son was pursuing, whereas it had been his custom in previous years to take a great interest in same; that his wife, on that evening, noted that he seemed to be particularly depressed and undertook to draw him out, but was unable to do so."

The hypothesized facts conclude as follows: "That at the time of his death he owned a membership in the Board of Trade, for which he paid, in 1938, $4,000; that he had money on hand of about $2,500 and that he had a home on Rockhill Road worth about $10,000 and was not subject to any encumbrances; that he owned the furnishings of his 9-room residence, and an automobile, which were not encumbered, and had three life insurance policies then having a cash value of $2,356.30; that none of his properties were mortgaged or encumbered; that early on the morning of September 19, 1940, his wife heard him run his car out of the driveway, and thought he was going to 6:30 mass, as was his custom; that about 11:00 o'clock (A. M. same day) his body was found in his car parked at the side of the road at 116th street and Wornall road in Jackson County, Missouri, and Mr. Kelly was seated in the rear seat, sitting on his right hand; that the motor was running and a hose had been attached to the exhaust pipe and run through the right rear window of the said automobile;

that the other windows were closed, and that deceased met his death from carbon monoxide poisoning, apparently having committed suicide.''

At the conclusion of the hypothesized facts Dr. Harrington was asked and answered as follows: ''Taking all those facts into consideration, we ask you to tell the jury whether or not, in your opinion, Roscoe A. Kelly was sane or insane at the time he committed the act of suicide? A. I would say without any question that he was insane. Q. Now, doctor, will you explain to the jury a little more fully how you arrive at this conclusion here? A. From the material that is presented here I conclude that the man was insane, because he was, as we say, seized by a part of his personality that drove him, in spite of his religious convictions, and he was so downcast that his mind centered that way, toward the goal of self destruction, and that he used his intelligence to be sure that the thing was done correctly; his intelligence was present, and he realized that it was possible to have his right hand free, and he might do something automatically to keep this thing from occurring. He was that sick or that insane that he protected himself against a self preservation tendency that he recognized might present itself automatically, that is, when he became partially asleep, and put the windows up, and doing all those things so thoroughly, ▮▮▮ that is personal proof that the man was insane, that is, that he was seized by this urge of self destruction, that his intelligence became disturbed and willingly did that which was necessary to be done, that his insane mind had set out to do. Q. Doctor, does the fact that you say he did go insane, apparently, as you say he did, and with the known history about the hose, and that he connected it to the exhaust pipe, and let it run up to the window, the glass window, and left the engine running, and, in other words, he did those things that you said were deliberately toward self destruction —state whether that would indicate or that it was any sign of sanity or otherwise. A. That was insanity rather than sanity.''

On cross-examination Dr. Harrington testified: ''Q. Are you basing your opinion in this case, that Roscoe A. Kelly was insane, because of an irresistible impulse, is that what you are trying to say? A. What do you mean? let's get it clear what you mean by 'irresistible impulse'. Q. Well, an impulse to do something that he could not control? A. What is your motive for that question? I want your whole background of the thing. Q. I want to know whether you think Roscoe A. Kelly carried out this suicide out there while under the control of an irresistible impulse to do that thing. A. Yes, that is what I have said all the way along. Q. That is what you say? A. Yes. Q. And that is what you based your opinion on? A. Yes, that is the whole thing he was seized, or had an impulse to do something that had to do with ending his life, and he made the arrangements to do it—which is insanity. The intelligence is under

the control of this other urge. Q. That is what we mean by irresistible impulse? A. That is all right to say that. Q. Now, before that impulse took control of him, as you describe it, he had to have mentality enough to know that if he connected the hose onto the car, and left the engine running, and put it in the back seat, that that would bring about his death, didn't he? A. I will have to say the same thing over again. He used this part of his personality that wanted to destroy him, and used his intelligence to reach that end. Q. That is, his intelligence was sufficient to know how to get that job done? A. Yes, absolutely no question about that. That does not mean he is not insane, that means he just had his intelligence under his control so it would do what he wanted it to do. . . . Q. Do you mean it was an insane impulse because it resulted in suicide? A. Yes, sir.''

On cross-examination several of plaintiff's witnesses who knew insured well and talked with him on occasions said that in their opinion insured was sane.

Plaintiff did not attempt to establish by any of the lay witnesses that insured was insane. Plaintiff's theory, as stated in the brief, was that insured's ''condition of melancholia grew upon him over a period of two years and culminated to the complete point of insanity on the morning of his death'', and plaintiff says that the evidence of the lay witnesses as to the changed behavior, along with the evidence of Dr. Harrington, made the question of insured's insanity at the time he committed suicide a question for the jury. On the other hand, defendant contends that the evidence, including Dr. Harrington's opinion, is not sufficient to make an issue on insanity, and in this connection defendant says that Dr. Harrington's conclusion that insured was insane was based solely on the fact of suicide, which is not sufficient to make an issue on insanity, as will be seen, infra.

The Aufrichtig case, supra, was on an accident insurance policy. The insured committed suicide by taking cyanide of potassium. The opinion recites [249 S. W. l. c. 914] that there was ''strong evidence tending to show the insanity of the deceased, and the jury was justified in finding that he was insane when he took the poison'', but the facts upon which insanity was predicated do not appear in the opinion. We take judicial notice of our own records, Houck v. Little River Drainage District, 343 Mo. 28, 119 S. W. (2d) 926, l. c. 930, and cases there cited, and by doing so, ascertain the facts in the Aufrichtig case. These, somewhat condensed, may be stated as follows:

The insured was 33 years of age, married, lived with his wife and two children, age 3 and 5; no marital discord, in good health and was engaged in the copper and sheet iron business in St. Louis; owned practically all the stock in a business worth about $55,000 net; in May, 1916, he was injured by the explosion of a compressed air tank; prior to injury he was cheerful and jolly; after the in-

jury his behavior gradually changed from what it had been; he would fall asleep in company; lost interest in his personal appearance; in the summer of 1918 he became despondent and would sit with his head in his hands; he became nervous, irritable, lost weight, eyes got heavy, red looking; in July and August, 1918 (he committed suicide August 12, 1918), was very depressed, morose, melancholy; stared at things on his desk, and at the floor, and sometimes would stare at one trying to talk to him, but would not talk; had an exaggerated notion of his success and wealth; said he was making $800 a day and could buy a Packard every 3 days; didn't seem to recognize a business acquaintance he had known for two years; said that some bars of tin he had cost $6,000 each, and that he was the only man in the country who had enough money to buy such; that he had a bunch of detectives watching the tin, and a bunch of detectives watching this bunch.

Some of the lay witnesses considered the insured as insane, and a doctor who resided near him and who had known him for many years and talked to him frequently considered him insane. Expert witnesses, basing their conclusion on the evidence of the lay witnesses, as to the insured's change in behavior, said that insured was insane when he committed suicide.

In Rodgers v. Travelers' Ins. Co., 311 Mo. 249, 278 S. W. 368, a question on the insured's insanity at time of suicide (October 26, 1921) was involved. Of the facts the opinion merely says that there was evidence pro and con on the question. Reference to the record discloses that there was evidence tending to show that insured, up to about two years before his death, was in good health, active, energetic, happy, jovial, generous; was a good dresser; became moody in summer of 1918; seemed morose; wouldn't talk much; wasn't contented anywhere; would drink after despondent spells; became worse in 1920; moody spells were more frequent; would sit as in a trance; would pick at things; became unable to sleep; would get up, walk about, turn the lights on and off; drank heavily; held newspapers upside down looking into space; his complexion grew ashen, his lips dry and feverish; lost, in summer of 1921, 25 to 30 pounds in weight; towards the end didn't want to change clothes; was unsteady in his walk; in September, 1921, his eyes became glassy; did not appear to understand when spoken to; failed to open letters from his mother; said anyone who committed suicide was a fool.

Insured (Rodgers case) was examined by a doctor September 27, 1921, who said that he had enlarged heart due to syphilitic lesion or disease and chronic alcoholism; that insured looked like a man who had been without sleep and without anything to eat; that he seemed to be looking away. The father and a brother of insured had committed suicide. On hypothesized facts, including the suicide of the father and brother, experts said that insured's mind was unsound.

Edwards v. Business Men's Assur. Co., 350 Mo. 666, 168 S. W. (2d) 82, involved the question of suicide while insane. In that case the insured shot himself, July 4, 1940, at age 68; had been for some years engaged in the milling business; but had financial losses and the mill closed in 1936; had been active in civic affairs, church and school, had been mayor of his town; in 1936, he was indicted and convicted of embezzlement of wheat stored with the mill; the judgment of conviction was reversed and cause remanded [137 S. W. (2d) 447] and was pending at time of his death; in the fall of 1939, his health began to fail; a cancer developed in the roof of his mouth and spread to back part thereof, which "was pretty badly eaten away"; weight depreciated from 165 to less than 120; his eyes crossed, had double vision and became unable to read, his hearing was impaired; could hardly talk; ate but little; slept but little "last few months"; had severe pain, and for two or three months before death "he was highly sensitive and nervous"; company upset him, but towards his wife and others he was patient and considerate to the end; Dr. Eichhorn, an osteopath, who treated insured, said that the cranial nerves were so involved that his "power to think or concentrate" was affected, and that for the last month and a half of insured's life, his mind was unsound; he shot himself in the bath room; door was locked, but he opened it and pulled back his pajama coat and showed wound to the nurse, and said: "Mary, I have shot myself"; told her to call his wife; the revolver was found on a clothes hamper in the bath room, and on the water closet was a dust cloth which was kept in a hall ▪▪▪ closet and used to dust the furniture. Dr. Harms, who also treated insured, and was defendant's witness, saw insured shortly after the shot and insured said to him, "I have shot myself"; and insured's wife said to Dr. Harms, "We had anticipated most anything"; Dr. Harms said insured's mind was sound; that he "knew what he was doing when the shot was fired; that insured knew and realized the cancer was incurable."

It was held in the Edwards case that the question of insured's insanity at the time he shot himself was for the jury.

In the cases, infra, by the supreme court of the United States, the question of suicide when insane, was involved. In Insurance Company v. Rodel, 95 U. S. 232, 24 L. Ed. 433, the court said [95 U. S. l. c. 238]: "Whatever may be our opinion as to the weight of the evidence given by the plaintiff in this case, it cannot be disputed that there was at least some evidence of Rodel's insanity. Besides the tedious and painful details of his conduct, manner, and looks given by his wife and others, evincing great strangeness and total change in his manner, there is this positive testimony of his sister-in-law, Emma Millentz. To the question put to her by the court, 'How did he look and act the last week?' she answered, 'Well, I thought he looked like he was insane.' The court asked her what she meant by

that, why she thought so; to which she replied, 'Because he used always to be so kind; when a person came he would get up; he was always gallant and polite, and toward the last he looked straight before him,—staring straight before him; before, he was very pleasant and polite, but towards the last he would not notice anybody when they came in at all; also, he walked entirely different. He looked as if confused in his mind. He did not seem to know what to answer if any person asked him a question.' And on cross-examination she said: 'I mean by insane that he was crazy, and that he always looked straight before him, staring, and before that he had always been happy and joyful. I do not know what to say that I mean by ''crazy.'' The other symptoms of being insane or crazy which he manifested were that his whole appearance seemed to be changed, and in his personal habits he seemed to neglect himself. His hair was unkempt, standing on end, and in his attire he was untidy, whereas before he was very accurate in every thing.' ''

Another witness (Rodel case) who had known the insured for a long time, saw him on the day of the suicide, and testified: ''Well, he looked to me a different man altogether; he was in a great state of excitement. His eyes looked—well, I cannot describe it now exactly, but he looked like a man who is out of his mind altogether. . . . The impression he made on me was that that man was not in his right mind.''

In Manhattan Life Ins. Co. v. Broughton, 109 U. S. 121, 3 S. Ct. 99, 27 L. Ed. 878 is this [109 U. S. 1. c. 126]:

''The court rightly refused to direct a verdict for the defendant, on the ground that there was no sufficient evidence to show that Ferguson was insane, or to render the defendant liable upon its contract. Without undertaking to recapitulate the evidence, it is sufficient to say that members of his family, and persons well acquainted with him in his business, testified that he was naturally of a lively, cheerful, sanguine disposition; that in 1874 he met with heavy losses in business, and his son died suddenly by falling from a window; that from that time forward there was a marked change in his demeanor; 'he was always walking with his head bowed down, and a gloomy expression, and the entire vitality and cheerfulness which the man had before was gone;' 'he was gloomy, dull, mopish;' 'he sat down in the office and moaned and would be gloomy there;' 'he always complained of his head; he would say, ''The trouble is here; it is all in my head, my head;'' ' that shortly before his death he had 'a vacant expression in his face;' 'he had a queer expression about his eyes; it was sort of a wild, unnatural expression;' 'that kind of expression which the human face takes on when one is frightened; a far-off, glassy look, as though the mind was dwelling on nothing;' that 'he was very much changed, and was very excitable; he looked different, and had a wild expression; he stayed a great deal

by himself when he came home from business; he would go to his room and lie on his bed with his hat and overcoat on, and not come out to his meals.' The experts called for the plaintiff testified that Ferguson was suffering from that kind of unsoundness of mind which they termed melancholia. There was clearly some evidence of insanity for the jury, and the question of its weight was for them, and not for the court.''

In Connecticut Mutual Life Ins. Co. v. Lathrop, 111 U. S. 612, 4 S. Ct. 533, 28 L. Ed. 536, the insured, shortly before his death, looked wild and frightened; a few hours before his death he told a witness good bye; said he was going "to a country where there is no return.'' He appeared to be "out of his head, mad, insane''; was in a saloon on the day of his death; said he was not drunk in body, but was in mind, looked unusual, face was red, eyes staring and wide open; said (not in the saloon, but on day of his death) that he was not going to church, but was going to hell'', and wanted to know if the witness to whom he was talking wanted to send any word to the devil. It was held that there was substantial evidence tending to show insanity.

Unusual behavior, in many will cases, has not been deemed sufficient to make a jury question on mental incapacity to make a will. See Rex et al. v. Masonic Home of Missouri et al., 341 Mo. 589, 108 S. W. (2d) 72; Hall et al. v. Mercantile Trust Co. et al., 332 Mo. 802, 59 S. W. (2d) 664; Winn et al. v. Grier et al., 217 Mo. 420, 117 S. W. 48; Sayre et al. v. Trustees of Princeton University et al., 192 Mo. 95, 90 S. W. 787; Nute v. Frye et al., 341 Mo. 1138, 111 S. W. (2d) 84.

But even in will cases a marked change in behavior has been considered as evidence tending to show unsound mind. In Knapp v. St. Louis Union Trust Co. et al., 199 Mo. 640, l. c. 665, 98 S. W. 70, it is said: "A marked change in a person's habits and thoughts is evidence of mental unsoundness. Insanity is indicated by proof of acts, declarations and conduct inconsistent with the character and previous habits of the person. As said by Schouler on Wills (3rd Ed.), p. 103: 'Insanity, to define that word, settles, as we have already indicated in the opinion of the best medical men, into a comparison of the individual with himself and not with others; that is to say, some marked departure from his natural and normal state of feeling and thought, his habits and tastes, which is either inexplicable or best explained by reference to some shock, moral or physical, or to a process of slow decay, which shows that his mind is becoming diseased and disordered.' ''

As appears, supra, defendant, in the present case, contends that Dr. Harrington based his conclusion that insured was insane upon the fact of suicide alone, and, suicide alone is not sufficient to support an inference of insanity. Holton et al. v. Cochran, 208 Mo. 314, l. c. 425, 106 S. W. 1035; Wacker v. National Life & Accident Ins. Co., 201

Mo. App. 586, 213 S. W. 869, l. c. 872; New York Life Ins. Co. v. King (8th Cir.), 93 Fed. (2d) 347; Supreme Council of Royal Arcanum v. Wishart (3rd Cir.), 192 Fed. 453; 78 Am. Jur., p. 765, Sec. 140. It is true that Dr. Harrington, on cross examination, was asked if he meant that it was an insane impulse "because it resulted in suicide", and answered, "Yes, sir", but, as appears, Dr. Harrington, on direct examination, said that "from the material that is presented here, I conclude that the man was insane", and then goes on to tell why.

While suicide alone is not sufficient to support an inference of insanity, it is a circumstance that is to be considered, along with others, on the question of insanity. Holton case, supra [208 Mo. l. c. 425]; 9 Wigmore on Evidence (3rd Ed.), p. 359. Defendant cites New York Life Insurance Co. v. King (8th Cir.), 93 Fed. (2d) 347. In that case it was held, on facts somewhat similar to the present facts, that there was no substantial evidence of insanity, but in the present case, we think that the hypothesized facts, as to insured's marked change in behavior, submitted to Dr. Harrington, were sufficient to support the inquiry made of him as to insured's insanity, and that Dr. Harrington's answer that insured was insane, along with the conceded fact of suicide, made the question of insured's insanity one for the jury.

Are plaintiff's instruction No. 2 and defendant's instruction D conflicting? Plaintiff's instruction No. 1 told the jury that if they found certain other predicated facts and found that insured was insane, as that term was "defined in another instruction", when he committed suicide, then to find for plaintiff. Instruction No. 2, the other instruction, follows:

"The court instructs the jury, with reference to the term 'insane' as used in these instructions, that if you find from all the facts and circumstances in evidence that at the time Roscoe A. Kelly inhaled poisonous gas through his own act his reasoning ▇▇▇ faculties were so impaired that he was not able, at the time, to understand the moral character of said act, and not able to distinguish whether said act was right or wrong, or that his will power was then so impaired that he was not mentally capable of controlling his conduct rationally, and was compelled by an irresistible and irrational impulse, then you should find that said Roscoe A. Kelly was insane at the time of said act, even though you may believe that said Roscoe A. Kelly may then have had sufficient understanding to know that the physical consequences of his said act would be his death."

Defendant's instruction D is as follows: "The law recognizes various degrees of insanity or unsoundness of mind. A man may be of sound mind for one purpose of law and of unsound mind for another. Suicide is only an accidental death and the plaintiff would only be entitled to recover in this case if the plaintiff has shown by a preponderance or greater weight of all the evidence in this case

that Roscoe A. Kelly, the insured, was insane or of unsound mind to such a degree and extent that he was entirely unaware of the moral consequences of his act, in other words, that he did not have mind or mentality enough to appreciate or understand the difference between right and wrong, and the burden of proving that the insured, Roscoe A. Kelly, was insane or of unsound mind to such a degree rests upon the plaintiff in this case and must be shown by a preponderance or greater weight of all the evidence in the case. You are therefore further instructed that unless you believe and find from a preponderance or greater weight of the evidence that at the time the insured, Roscoe A. Kelly, took his own life by inhaling gas fumes in his automobile, he was insane or of unsound mind to such a degree as not to be able to know or understand the moral consequences of his act and to appreciate or understand the difference between right and wrong, then the plaintiff cannot recover in this case and your verdict must be in favor of the defendant. . . . "

In the Aufrichtig case, supra [298 Mo. 1], the instruction defining insanity is not set out in the opinion, but again referring to the record in that case we find this instruction:

"The court instructs the jury that the expression 'of unsound mind' and the expression 'insane' as used in the other instructions given by the court are equivalent to each other, that is, have the same meaning, and that they mean such a deranged condition of the mind as to render a person incapable of distinguishing between right and wrong or unconscious at the time of the nature of the act he is committing, or where though knowing the act he is committing and its nature and though able to distinguish between right and wrong, yet his will, that is, the governing power of his mind, is so far destroyed or impaired that he cannot control his actions."

In the Aufrichtig case the court said [249 S. W. 1. c. 917]: "As said there is complaint of the instructions defining insanity. We shall not go into details. They are practically rescripts of instructions approved in Ritter v. Mutual Life Insurance Co., 169 U. S. 1. c. 149, 18 Sup. Ct. 300, 42 L. Ed. 693, and cases therein cited."

In the Rodgers case, supra, plaintiff requested and was refused instruction C, which follows [278 S. W. 1. c. 370] : "The court instructs the jury that, if they believe from the evidence that Frank W. Rodgers inflicted upon himself the gunshot wound which caused his death, and further believe, from all the facts and circumstances in evidence before you, that, at that time, his reasoning faculties were so far impaired by physical and mental disease that he was not able at the time to understand the moral character of said act, and was not then able to distinguish whether his said act was right or wrong, and that his will power then had been so far impaired by disease that he was not then mentally capable of controlling his conduct rationally, and that he was impelled to said act by an irresistible and irrational impulse, then his said act was insane within the meaning of said policy as

modified by the law of Missouri, even although you may further believe from the evidence that, at the time of said act of Frank W. Rodgers, he may have had sufficient understanding to know that the physical consequences of said act would be his death.''

Defendant's (Rodgers case) instructions 5, 7, 8 and 9, all similar, were given on behalf of defendant; only No. 7 is set out in the opinion. The judgment below, in the Rodgers case, was for defendant, but the judgment was reversed and the cause remanded because of the giving of defendant's instructions 5, 7, 8 and 9, and the refusal of plaintiff's instruction C. Of defendant's ▮▮▮ instructions 5, 7, 8, and 9, the court said this [278 S. W. l. c. 370]:

''A thorough research of the authorities convinces us that instructions 5, 7, 8, and 9 for defendant are saturated with error of the most prejudicial character, under the great weight of the more recent well-considered cases. These instructions . . . leave out . . . the further idea that his will power (an attribute of the mind) might have been so reduced that he could not resist an insane impulse to commit the act.''

In the recent case of Edwards v. Business Men's Assurance Co., supra, certain instructions given on behalf of defendant were challenged by plaintiff who lost below. After a discussion of the point, we said: ''The instructions are accordingly erroneous and particularly so in that they entirely omit the idea that insured's will power might have been so reduced that he could not resist an insane impulse to take his life, if he did so.''

Instruction D in the present case is bad because of the omission of the idea of insane impulse as was held in the Rodgers and Edwards cases, supra, and because of this omission, instruction D is in conflict with plaintiff's instruction No. 2.

Defendant says that instruction D ''was taken almost bodily'' from Rubinstein v. New York Life Ins. Co. (Mo. App.), 153 S. W. (2d) 760, l. c. 764. In that case the court said [153 S. W. (2d) l. c. 765]:

''Regardless of what courts of other jurisdictions have said with respect to the doctrine of 'irresistible impulse,' as a test of responsibility for a person's actions, we think the test as applied by our courts is definitely settled to be whether the person whose actions are in question was capable of knowing the difference between right and wrong at the time of the act.''

If it was intended, in the Rubinstein case, to rule that the theory of insane impulse, when the evidence supports such, is not to be submitted in an action on an accident insurance policy, where the insured commits suicide, then such ruling is out of line with the ruling by this court in the Aufrichtig, Rodgers and Edwards cases, supra. See also, Laventhal v. New York Life Ins. Co. (E. D. Mo.), 40 Fed. Supp. 157, l. c. 159.

The question of unduly emphasizing that the burden of proof was on plaintiff will not likely arise at another trial. The judgment should be reversed and the cause remanded, and it is so ordered. *Dalton, C.*, concurs; *Van Osdol, C.*, not sitting.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.