Joan K. GARMON, Plaintiff-Respondent,

v.

GENERAL AMERICAN LIFE
INSURANCE COMPANY,
Defendant-Appellant.

No. 42664.

Missouri Court of Appeals,
Eastern District,
Division Two.

Aug. 11, 1981.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Oct. 16, 1981.

Application to Transfer Denied
Dec. 14, 1981.

Joseph M. Kortenhof, St. Louis, for defendant-appellant.

Charles E. Gray, St. Louis, for plaintiff-respondent.

PUDLOWSKI, Presiding Judge.

Plaintiff's husband, age 44, committed suicide on April 11, 1976. Plaintiff, Joan K. Garmon, filed a three count petition against defendant, General American Life Insurance Company (hereinafter General American) seeking $172,000 plus interest as beneficiary under the accidental death benefits provisions of three insurance policies. From a jury verdict of $205,191.78 in plaintiff's favor, defendant has appealed. Defendant alleges trial court error in (1) failing to direct a verdict in its favor; (2) the giving of plaintiff's verdict directing instruction No. 3 and (3) rulings on objections during closing argument. We affirm.

Plaintiff was the beneficiary under three separate policies of group insurance issued to McDonnell Douglas Corporation on the life of the decedent, William L. Garmon. Insurance policy MCP–5350 provided for a $100,000 accidental death benefit. Policies MCP–5546 and 5546–A each provided a $36,000 life insurance benefit and $36,000 accidental death benefit. General American paid $72,000 as life insurance benefits to plaintiff, but refused payment of $172,-000 in accidental death benefits. The de-

fense was suicide while sane.[1] It has long been the rule in Missouri that the taking of one's own life while sane is not an accident while intentional suicide while insane is an accident. *Sommer v. Metropolitan Life Insurance Co.*, 449 S.W.2d 644, 645 (Mo. banc 1970); § 376.620 RSMo 1978; *Lemmon v. Continental Casualty Co.*, 350 Mo. 1107, 169 S.W.2d 920, 921 (1943). Thus, the only question for the jury was whether or not the insured, William Garmon was sane or insane at the time he committed suicide. Since defendant raises the failure of the plaintiff to make a submissible case, we set forth the evidence in the light most favorable to plaintiff, giving plaintiff the benefit of all favorable inferences. *Barnett v. M & G Gas Co.*, 611 S.W.2d 370, 371 (Mo.App. 1981).

Joan and William Garmon were married in 1954. They had three children, Jeff, Linda and Richard. Only Richard, age 14 remained at home at the time of his father's death. The insured took his first and only job as an engineer with McDonnell Douglas in 1957. He was employed at the time of his death as a project aerodynamist earning $700 per week with responsibility for supervising other engineers. Mr. Garmon had only minor physical ailments. He suffered from hay fever. He also had a minor throat problem for which he saw a doctor in 1973 and a mild heart disrhythum, for which he was not taking medication. The deceased's history of emotional problems began in 1957. In the fall of that year he developed frequent attacks of extreme anxiety which eventually became disabling. On November 19, he came home from work visibly upset, depressed and contemplating suicide. He was hospitalized for three days for this condition and returned to work three weeks later. The psychiatrist who treated him at that time found no evidence of psychosis or pre-psychosis.

Garmon's emotional problems manifested themselves in depression and obsession with death and suicide. This preoccupation included describing in detail various ways to commit suicide to his wife; and describing as "lucky" those about whom he read committing suicide in newspaper articles. He frequently recited to his wife his favorite poem, "Richard Cory."[2]

Early in their marriage, the insured was active in many outside activities including scuba diving, church and scouting. Gradually, these activities diminished until in the few years immediately preceding his death, the insured had no interest outside of his work. During the five years prior to his suicide, the Garmon's socialized on only one or two occasions. His wife stated this was because her husband had negative feelings toward people in general and did not desire social relationships. Over the years, Garmon grew increasingly depressed, isolated and uncommunicative. Weeks and months would sometimes go by without any conversation or physical contact with his wife. His routine in the evenings developed a disturbing pattern. When not working late, he would come home, eat dinner and then spend 1–2 hours alone in the bathroom. He would then sleep or watch television and then spend another 1–2 hours alone in the bathroom.

In August, 1975, plaintiff filed a petition for divorce. Her husband's isolation, depression and morbid attitude made life for her intolerable. After the divorce action was filed, Garmon agreed to seek professional help. His wife then dismissed her petition. He and his wife both visited Dr. Gajo, a psychologist specializing in marriage counseling. After ten sessions with

---

1. All there policies prohibited payment of the accidental death benefits if the insured committed suicide while sane. Policy 5350 excluded "suicide or intentionally self-inflicted injury while sane or insane." The other two policies excluded "suicide (or any attempt thereat) while sane ...." That part of Policy 5350 excluding suicide while insane from the accidental death benefits is void. *Aufrichtig v.*

*Columbia National Life Insurance Co.*, 298 Mo. 1, 249 S.W. 912, 916 (1923); § 376.620 RSMo 1978.

2. In fine, we thought that he was everything to make us wish that we were in his place.

　　．　　　．　　　．　　　．　　　．

And Richard Cory, one calm summer night, went home and put a bullet through his head.

Dr. Gajo in the fall of 1975, he abruptly quit the counseling even though he acknowledged to Dr. Gajo he had serious problems and needed professional help more than ever. At this time irrational outbursts over minor annoyances also became more frequent.

His behavior at home was in stark contrast to his behavior at the office. There he had a very responsible position which he performed capably. It required hard work and intelligence. Two of his colleagues and a secretary testified that he was well regarded and did not appear to have any emotional problems. He always appeared jovial and happy at the office. However, they never saw him socially except on a couple of occasions.

Matters at home grew worse between the couple. On April 5, 1976, Mrs. Garmon again filed for divorce, took their fourteen year old son, Richard, and left for Connecticut. On Friday, April 8, 1976, Garmon went to the office and appeared to be in excellent spirits according to his colleagues. On April 11, he took a 30–30 Sears & Roebuck rifle which he had purchased in September, 1975, went down into the basement, placed the muzzle of the rifle in his mouth and shot himself.

He left a most unusual suicide note. It consisted of 5 separate notes, consisting of 55 pages, one addressed to the entire family and a note to each of the members individually. The notes were apparently started in September, 1975, shortly after he started seeing Dr. Gajo and written at various times over the next eight months. Much of the notes contain advice to his wife and to his children. Ostensibly, the pending divorce and his inability to live without his wife are given as the reason for committing suicide. However in the letter addressed to his wife he wrote, "The pain of my twisted behavior over the years and its ultimate consequences are just more than is possible for me to live with." He concluded by writing, "I think this letter would make it clear to anyone who understands human behavior that I had psychological problems and hang ups that were present long before I met you and that you were not in any was responsible for them ... maybe I was always destined to go off the deep end sooner or later—and this situation made it sooner."

Dr. Paul Hartman, a psychiatrist, reviewed Dr. Gajo's notes of the counseling sessions and the suicide notes. He testified to a reasonable degree of medical certainty that the suicide note was written by someone who was mentally ill, and had a psychiatric depression. He stated that the mental processes apparent in the suicide note was evidence of his insanity. He further testified that Garmon could not understand the moral consequences of his act, could not distinguish right from wrong and committed suicide in obedience to an uncontrollable impulse.

Dr. Gajo testified that Garmon was a brilliant, compulsive individual and had to succeed under all conditions. Garmon realized he was an emotional cripple. He committed suicide because he was driven and obsessive. Dr. Gajo further testified that Garmon had an insane condition at the time he committed suicide and he had no control over his act of committing suicide.

Another psychiatrist, Dr. George Murphy, testified to the apparent reason for the difference between Garmon's home and business life. He stated professionals such as Garmon who are unable to share their feelings of dependency cannot overcome the accompanying sense of isolation. They often successfully prevent their associates from recognizing their depression and stun their close colleagues when they proceed quietly to a well planned suicide. However, Murphy testified that he reviewed Dr. Gajo's notes, Dr. Hartman's notes, and the suicide notes and concluded that Garmon was sane at the time he committed suicide. He also testified that 99% of the individuals who commit suicide have a psychiatric illness but Garmon fell into the 1% who did not.

In his first point, defendant complains that the plaintiff failed to make a submissible case and consequently his motion for a directed verdict at the close of all the evidence should have been granted. First, he

states that Dr. Gajo's and Dr. Hartman's conclusions that Garmon was insane cannot constitute substantial evidence because they were based solely on the fact Garmon committed suicide. Defendant points to the answer given by Dr. Hartman to the following question:

Q: What you are really saying here, are you not Doctor, that because he committed suicide [he was insane], isn't that frankly it?

A: That's the big thing.

■ Defendant is correct in its assertion that the fact of suicide alone is not sufficient to support an inference of insanity. *Lemmon v. Continental Casualty Co.*, 350 Mo. 1107, 169 S.W.2d 920, 927 (1943). However, it is a circumstance that may be considered, along with others on that question. *Lemmon, supra.* Defendant's contention is without merit. A review of the record reveals that Dr. Hartman based his opinion upon not only the fact of suicide, but also the suicide notes, Dr. Gajo's notes and the insured's behavior put forth to him in a hypothetical question. Dr. Gajo's opinion was based upon personal counseling of the deceased as well as the suicide notes.

■ Next, defendant cites *New York Life Insurance Co. v. King*, 93 F.2d 347 (8th Cir.1937) and *Boaz v. Mutual Life Insurance Co.*, 146 F.2d 321 (8th Cir.1944), both accidental death benefit cases applying Missouri law. In *King* and *Boaz*, the court concluded that the testimony of the doctors who testified that the insured was insane was not entitled to any probative value. Defendant would urge the same result here. The court based its conclusions on the fact the neither doctor had seen the insured and there was little evidence of unusual behavior. While neither of these cases is binding on this court, they both may be distinguished. Here there was ample evidence based on the deceased's change in behavior over the years, his depression and obsession with suicide, the lengthy suicide notes and the information related by the insured to Dr. Gajo for the two experts to conclude that the deceased was insane when he committed suicide. Dr. Gajo's and Dr. Hart-

man's testimony constituted substantial evidence. Their conclusion that the insured was insane, and the evidence of the insured's behavior along with the conceded fact of suicide, made the question of the insured's insanity one for the jury. *Lemmon v. Continental Casualty Co.*, 350 Mo. 1107, 169 S.W.2d 920, 927 (1943). This point is ruled against defendant.

■ In his next point, defendant attacks the plaintiff's verdict director, Instruction No. 3. This instruction provided:

Your verdict must be for plaintiff if you believe:

First, that William L. Garmon inflicted upon himself the gunshot wound which caused his death,

and

Second, that at that time either:

he was insane in that his reasoning faculties were so impaired that he was not able to understand the moral character of said act and not able to distinguish whether said act was right or wrong,

or

he was insane in that his will power was then so impaired that he was not mentally capable to controlling his conduct rationally, and was compelled by an irresistible and irrational insane impulse.

First, defendant states that the third paragraph of this instruction improperly referred to the moral character of the act of suicide and that the instruction improperly states that only an immoral man could commit suicide. Further, the statements in Instruction 3 do not comport with present day concepts of personal freedom. We do not find defendant's point well taken. There is no approved MAI instruction defining insanity under these circumstances. Supreme Court Rule 70.02 requires that where there is no applicable MAI instruction, an instruction which is simple, brief, impartial, and free from argument, shall be submitted to the jury.

In *Lemmon v. Continental Casualty Co.*, 350 Mo. 1107, 169 S.W.2d 920 (1943), the Missouri Supreme Court exhaustively analyzed all cases with instructions defining

insanity. The court 169 S.W.2d at 928 found the following instruction a correct statement of the law:

> [I]f you find from all the facts and circumstances in evidence that at the time Roscoe A. Kelley inhaled poisonous gas through his own act *his reasoning faculties were so impaired that he was not able, at the time to understand the moral character of said act, not able to distinguish whether said act was right or wrong*, or that his will power was then so impaired that he was not mentally capable of controlling his conduct rationally, and was compelled by an irresistible and irrational impulse, then you should find that said Roscoe A. Kelley was insane at the time of said act .... (emphasis added).

In the course of their analysis, the court examined the instruction in *Aufrichtig v. Columbia National Life Insurance Co.*, 298 Mo. 1, 249 S.W. 912 (1923), wherein the following instruction defining insanity was upheld:

> [Insanity] ... mean[s] ... *a deranged condition of the mind [such] as to render a person incapable of distinguishing between right and wrong* or unconscious at the time of the nature of the act he is committing ... and though able to distinguish between right and wrong, yet his will, that is, the governing power of his mind, is so far destroyed or impaired that he cannot control his actions. (emphasis added) [3]

The essential ingredients of insanity which both *Lemmon* and *Aufrichtig* recognize is that the insured's mental faculties are such as to leave him incapable of distinguishing whether the act of suicide was right or wrong. The *Lemmon* case further explicitly recognizes that a reference to the insured's not understanding the moral character of the act of suicide is correct. The instruction approved in *Rodgers v. Travelers Insurance Co.*, 311 Mo. 249, 278 S.W. 368 (1925) also recognized these two principles. Consequently, the submission of that portion of the instruction about which defendant complains is not error.

Next, defendant complains that there was no evidence to support the submission of that part of the instruction referring to an "irresistible impulse." He argues that "impulse" means "a sudden spontaneous inclination" citing Webster's New Collegiate Dictionary and *Curry v. Federal Life Insurance Co.*, 221 Mo.App. 626, 287 S.W. 1053, 1056 (1926). Thus, Garmon's suicide could in no manner be considered "impulsive" as it was methodically plotted for at least eight months. We do not accept defendant's narrow definition. The word "impulse" as used in *Curry, supra*, was in the context of "impulse of the moment," a very different context than we have here.

The meaning of an instruction must be determined from its entirety and not by considering only isolated words or phrases. *Hart v. City of Butler*, 393 S.W.2d 568, 577 (Mo.1965). An "irresistible impulse" according to 41 Am.Jur. Incompetent Persons, § 2, p. 543, is, "a form of insanity, ... by which a person is irresistibly impelled to the commission of an act ...." Webster's Third New International Dictionary also defines "impulse" as "an inspiration or motivation; ... a propensity or natural tendency usually other than rational." We find nothing that would restrict the meaning of the words to the narrow one advanced by the defendant. This point is ruled against defendant.

He next alleges that Instruction No. 3 omits a reference to insanity being the product of a "physical or mental disease" and consequently is an incorrect statement of the law on this subject. This is a point which defendant makes for the first time on appeal. He did not make this specific objection during trial. Rule 78.07 requires that specific objections to instructions which were not made at the trial before submission to the jury, must be set forth in the motion for new trial to preserve the error for review. Defendant did not raise this point in his motion for new trial and

---

**3.** The instruction from *Aufrichtig* is set out in full only in *Lemmon, supra* 169 S.W.2d at 928.

consequently has preserved nothing for review.[4]

■ In his third point, defendant alleges that the trial court erred in overruling his objection to plaintiff's reference to General American collecting premiums, but refusing to pay out benefits. During plaintiff's closing argument the following occurred:

MR. GRAY: May it please the Court, ladies and gentlemen of the jury. As Mr. Kortenhof says we must have justice in the courtroom. General American had no hesitancy in collecting premiums—

MR. KORTENHOF: Just a minute. That isn't an issue in the case and I object to it. Move it be stricken.

THE COURT: Overruled. Let's proceed.

MR. GRAY: (Continuing) They want a premium—

MR. KORTENHOF: May my objection go to this entire line of argument. It's not an issue in the case. It's inflammatory, and it's not proper for any reason.

MR. GRAY: (Continuing) And then when we—the money. They want to come in and say, "Be fair. We collected the money but we don't want to pay out."

MR. KORTENHOF: Object to that. That's improper and inflammatory argument. That has no basis in the evidence and I object to it again. If my objection can go to the entire line, I won't interrupt him.

THE COURT: It may do so. Objection is overruled.

In her petition, plaintiff alleged that premiums had been paid to defendant. In its answer, defendant admitted that it issued three policies of group insurance, but denied every other allegation in plaintiff's petition. There was no evidence of premiums being paid. Despite the unsupported statement of counsel that they had, we do not conclude that his statement was so prejudicial as to require reversal. *Wilkins v. Cash Register Service Co.*, 518 S.W.2d 736, 746 (Mo.App.1975).

---

4. Moreover, we might add that both instructions approved in *Lemmon, supra*, contain no

■ Defendant in his fourth point argues that the following argument by plaintiff's counsel also constituted error:

* * * General American cannot employ some expert and defeat this widow's rights. And by you telling General American that—that they cannot take an expert just—

MR. KORTENHOF: That's improper argument, punitive. It's improper and I object to it for all purposes and reasons.

THE COURT: Objection overruled. Let's proceed.

MR. GRAY: (Continuing) I'm not being punitive to General American. I want justice from them and I don't want them defeating a claim by taking an expert that will read something here and say "Mr. Garmon you didn't have any hang-ups."

The trial court has considerable discretion permitting argument to the jury and its ruling will generally be deferred to on appeal because of its better position to know the meaning, construction and effect of such argument. *Marler v. Pinkston*, 293 S.W.2d 385 (Mo.1956). We cannot say that the trial court abused its discretion in this matter.

■ Finally, defendant argues that the court erred in refusing to allow him in closing argument to compare the definition of insanity in this case with insanity in the criminal law. The trial court properly exercised its discretion and sustained an objection to that analogy. *Marler, supra*. The jury only had to find that Mr. Garmon did not know the difference between right and wrong as to the particular act of suicide not that he did not know the taking of another's life was right or wrong.

Affirmed.

WEIER and GUNN, JJ., concur.

reference to "mental disease or defect."