## BOAZ v. MUTUAL LIFE INS. CO. OF NEW YORK.

No. 2163.

District Court, E. D. Missouri, E. D.

Dec. 27, 1943.

98

Otto O. Fickeissen and Ivon Lodge, both of St. Louis, Mo., for plaintiff.

James C. Jones, Jr. and Orville Richardson (of Jones, Hocker, Gladney & Grand), both of St. Louis, Mo., for defendant.

HULEN, District Judge.

This is an action on a double indemnity insurance policy issued by defendant to Bert Boaz, insured, with plaintiff as beneficiary. Plaintiff conceded and the cause was tried on the theory that insured's death was the result of self-destruction. The issue: was insured sane or insane at the time he performed the acts resulting in death. If insane, death was accidental under the terms of the policy of insurance and plaintiff is entitled to recover under the accidental provision of the policy. If sane, defendant is not liable under its policy.

At the conclusion of plaintiff's case, the defendant moved that the jury be instructed to return a verdict for defendant. The court then stated its intention to sustain the motion, whereupon plaintiff asked leave to dismiss "her action without prejudice." The request was granted. Defendant, by motion, now seeks to have the order allowing plaintiff to dismiss, "without prejudice", set aside and an order dismissing plaintiff's action "with prejudice". We believe the court's action on the present motion will best be understood by reference to the testimony offered by plaintiff.

Insured had been engaged in the contracting business in St. Louis for many years prior to his death. His wife, plaintiff in this action, testified that she first noticed a change in his "health" in September, 1941. Prior to that time insured had been in apparent good health, strong, active, interested in sports, enjoying the association of friends and "card parties". He was aggressive in business and an able executive in "driving" construction work to completion.

In the latter part of 1941 insured began to lose weight. After January, 1942, he did not go to the office regularly. About this time he developed trouble with his "teeth", evidenced by swelling of the jaw. This was relieved by dental service. Between July 28th and September 9, 1942, he was examined and seen "once or twice a week" by Dr. Diehr. Dr. Diehr testified to these symptoms: Loss of weight; foul odor of breath; cast to skin; cough; spit up pus; progressive physical weakness and some temperature. Dr. Diehr saw insured two or three days before insured's death, on September 11, 1942. At that time the symptoms were "weakness", his "pulse rate too rapid", "shortness of breath" and "pain in chest". The diagnosis was cancer of the lung.

Plaintiff called ten witnesses. These witnesses had known plaintiff for various periods ranging from twenty-five years to a few months. There is little contradiction in the facts detailed by them. Between the fall of 1941 and the time of insured's death they observed a change in the insured. He "lost weight"; grew "sicker and weaker"; "lost interest in playing cards"; "lost ambition to do things"; "seemed depressed"; "seemed in trouble"; "did not care to associate with people"; "would set and stare"; "seemed in terrible pain during coughing spells".

In the year 1940 business troubles developed for the insured. He was an officer and directing manager of the Boaz-Kiel Construction Company. Work on contracts they were then engaged in executing did not go well. In April 1942 insured insisted "on pay rolls being kept down"; was opposed to sufficient help for quick completion of the work. This had not been his previous habit.

The Boaz-Kiel Construction Company was sued by one Carlos, for a portion of the profits on one of its large construction jobs. This suit was in the state courts for a number of years. A referee was appointed to take testimony. He made a report, finding a substantial sum of money due plaintiff in that suit from the Boaz-Kiel Construction Company. Insured was indebted on his personal note to the Boaz-Kiel Construction Company between "$40,000.00 and $50,000.00". Shortly before the insured's death the state courts affirmed the report of the referee in the Carlos case. Collection of the judgment would have consumed all of the assets of the Boaz-Kiel Construction

Company, including a part at least of the note owed by the insured to the company. Insured was of the opinion that the Carlos suit "was in the bag" until the report of the referee was confirmed by the state court. He then insisted that an appeal be taken from the judgment of the trial court. On the afternoon preceding insured's death he received and signed at his home an affidavit for appeal of the Carlos case. He requested that the affidavit be left with him "as he wanted to think it over". On the same afternoon insured was informed that Mr. Kiel, the other principal owner of the Boaz-Kiel Construction Company, had made an offer of settlement in the Carlos suit without consulting insured. This information "seemed to take the starch out of him". Witnesses who were present at this time, when the Carlos case was being discussed, testified that the answers given by insured to questions were "in a normal manner", and that they thought insured was sane at the time. These matters transpired less than twelve hours preceding the death of insured. The same day insured signed the pay roll check.

From October 1941 to May 1942 insured was employed by the Mississippi Gravel & Sand Company as manager. The owner of this business testified that he did not "think he (insured) was the man he was previous to the time he got sick". While with this concern, according to its owner, insured paid too high a price for rental for some machinery. This transaction resulted in insured's resignation as manager of the Mississippi Gravel & Sand Company.

Insured's death occurred on Friday night. On Wednesday preceding, insured had gone by the office of Dr. Consello. Insured's wife waited for him in the lobby of the building where Dr. Consello's office was located. Dr. Consello was not called as a witness. On leaving Dr. Consello's office insured told his wife that the doctors "were not fooling him", he knew he had a cancer and only a few months to live. At that time he requested his wife not to let any one take him to a hospital, as Dr. Diehr had told him that he could not stand an operation.

Witness Elan testified to a similar conversation with insured and added, that several years before he had a conversation with insured regarding a man well known to them who had died of cancer after a lingering sickness, during which time he had suffered great pain. Mr. Elan stated that he and insured at that time agreed "they would not go through with that pain". This witness stated he was not surprised that the insured had committed "suicide", and had he been in the condition of the insured "he would have done the same thing".

Some time during the afternoon preceding the night of insured's death, insured suggested to his wife that she go downtown and purchase some shoes. He also made a suggestion that she go to market. She did neither. On insured's insistence his wife left the home about 7 p.m. to go to a picture show. Insured said he was tired and did not want any one around—not even his wife. The negro maid left the Boaz home soon after Mrs. Boaz's departure for the picture show. One of plaintiff's witnesses testified to a telephone conversation he had with insured some time on Friday in which insured requested him not to come over to visit him that evening, as he had been having too much company and he wanted to go to bed and get some rest. Mrs. Boaz returned from the picture show after midnight. She found the house "lit up". She entered through the back door and found a wad of paper on the floor in front of the door, with a note on it reading: "Mother, look out for gas. Put something over your mouth, and open the doors and windows. I am in the basement. Call Elmer. He can help you take care".

A like note was just inside the front door on a wad of paper where it would be "easily noticed by any one entering the front door". Insured was found in the basement, sitting before a gas stove, a blanket over his head, his head resting on the stove protected from the metal by a pad; the gas was on. Insured was dead. Cause of death is not questioned. Going to her room on the second floor of the residence Mrs. Boaz found a sealed envelope, marked on the outside—"Please do not open this. It is for Mrs. Boaz". On the inside was a note reading as follows:

"My dear wife:
As you know I am a very sick man, and I know I cannot get well. I no longer can go out and hit the ball and make things go and I cannot stand it any longer. It is just all too much for me. It want you to remember some of the things I have said to you. Tell Son I want him to be a good boy, and I know he will. Mother, I can't find words good enough to tell you what a fine wife you have been to me, so please forgive me.

I want to thank everyone that have done so many nice things for me. So I say goodbye and good luck to all.

Dad".

The notes left at the front door, the back door and in plaintiff's room on the second floor, in sealed envelope, were all in the hand-writing of insured.

Plaintiff was one of the last persons to see insured alive. She testified that her husband's mind "was right" at all times when she saw him. Dr. Diehr said he did not consider insured of unsound mind the last time he saw him. Asked a hypothetical question, based upon part of the testimony offered in the case, this witness stated he was unable to give an opinion on insanity. Two of plaintiff's witnesses gave an opinion that insured was of unsound mind at the time he committed the act resulting in his death. All others testified either to soundness of mind or were without an opinion. Dr. Barnes, expert on mental and nervous diseases, gave an opinion of unsound mind. He had never seen the insured. He sat in the court room and listened to all of the testimony offered by plaintiff and then gave an opinion based on the testimony he had heard, that the insured was of unsound mind "at the time of his death". This expert, on cross-examination, was asked to point out any act or statement of the insured which he considered evidence of insanity. The witness was unable to do so. He stated his opinion was based on *all* acts of insured detailed from the witness stand. Referring to the notes left by the insured the doctor stated that the "thought content not bad". The other witness, expressing an opinion of unsound mind of insured, was Mr. Fickeissen. This witness had known insured for about twelve years. He had advised him on legal matters. He was of counsel in this case. Insured's will was written about twelve days before his death. This witness testified that insured was of sound mind at the time of executing his will. On cross-examination the witness was asked to give some illustration upon which his opinion of unsoundness of mind was based and in answer to the question, stated the insured "sat and stared"; "did not care if we stayed" (on a visit of the witness to insured's home); "did not care to play cards"; changed from a "healthy, robust man to a weak, infirm, moody individual", without interest in sports or the association of his friends.

We have not attempted to detail all the testimony. The foregoing constitutes the material facts bearing upon the issue.

■ At the close of plaintiff's case the court was of the opinion that the testimony, viewed most favorably to plaintiff, was as consistent with soundness of mind of insured at the time of his self-destruction, as with unsoundness of mind, and that there was no substantial evidence upon which the question of accidental death could be submitted to the jury. While two witnesses, one a layman and one an expert, testified in their opinion insured was of unsound mind at the time of his death, the testimony upon which these opinions are based is in the record, and we do not consider these opinions substantial evidence. The United States Court for the Eighth Circuit, in the case of New York Life Ins. Co. v. King, 93 F.2d 347, loc. cit. 353, said: "There is nothing in the testimony in this case, other than the fact of suicide itself, upon which to base an opinion that the insured killed himself as the result of insane impulse. The testimony of Dr. Romeiser, under the circumstances, is not substantial evidence."

■ Suicide alone is not proof of insanity. Plaintiff had the burden of proof and in the court's judgment failed to sustain it. It is only when the reasoning faculties are so far impaired that one is not able to understand the moral character, general nature, consequences and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse, that he may be found to be insane.[1]

■ The only evidence as to insured understanding the moral consequences of the act he was about to perform, is by the notes left. They show he did understand the moral character of the act he was about to commit. The notes indicate he wanted it understood why he was taking his life, namely: because he knew he could not recover and could not carry on his business. He asked forgiveness of his wife. The

[1] Mutual Life Insurance Co. v. Terry, 15 Wall. 580, 21 L.Ed. 236; Charter Oak Life Insurance Co. v. Rodel, 95 U.S. 232, 24 L.Ed. 433; Manhattan Life Insurance Co. v. Broughton, 109 U.S. 121, 3 S.Ct. 99, 27 L.Ed. 878; Accident Ins. Co. v. Crandal, 120 U.S. 527, 531, 7 S.Ct. 685, 30 L.Ed. 740; Ritter v. Mutual Life Ins. Co. of New York, 169 U.S. 139, 18 S.Ct. 300, 42 L.Ed. 693.

notes indicate clearly he understood the effect of the act he was about to commit, because he went to great pains to warn his wife on her entering the house, to beware of gas fumes and take immediate steps to insure her safety. There is no evidence of an insane impulse, either in committing the act of self-destruction, *or at any other time in insured's life*. Viewed most favorably to the plaintiff, the evidence is equally consistent with a sane as an insane impulse.

Plaintiff in oral argument in opposing defendant's motion for a directed verdict relied chiefly on the Lemmon case,[2] and the Edwards case.[3] In the Lemmon case there was no other explanation of the change in conduct, habits and physical appearance of the suicide subject, except mental disturbance. In the Edwards case there was testimony that the deceased had a cancer in the roof of his mouth that directly affected the nerve center and interfered with power of thought and concentration. There was evidence that the pain was so great as to drive the victim into uncontrollable acts such as running around in circles until he fell over and running back and forth from the bathroom to his bedroom. These cases are distinguishable from the case at bar. Here we have a man whose body is racked with pain and afflicted with an incurable disease that he believed was slowly taking his life. He was fast becoming a burden and care. He believed that he could live only a few months of tormented life. He was beyond human help. To this burden was added business failure and possible bankruptcy. Even then, he does not perform one act (aside from the act of suicide) that any witness, including the expert, was prepared to call or characterize as insane. If there is ever justification in the judgment of a sane person for taking one's life, the court is impressed that insured came within that class.

■ On the present motion it is plaintiff's position, as evidenced by brief filed, that the Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c, do not give the court authority to modify, amend or set aside the order heretofore made dismissing this case without prejudice. This contention cannot be sustained.

"A court has inherent power over its judgments throughout the term, and this goes to the extent that the court may vacate, modify or change its decision on the merits. * * * This power to open, vacate or set aside its judgment during the term applies to errors of law as well as to errors of fact." Suggs v. Mutual Ben. Health & Accident Assn. 10 Cir., 115 F.2d 80, 82.[4]

Plaintiff further contends that since defendant filed a motion for directed verdict under Rule 50(a) of the Federal Rules of Civil Procedure that the court cannot now set aside the order of dismissal without prejudice and enter an order under Rule 41(b) of dismissal with prejudice. The action taken by the court, while prompted by defendant's motion for a directed verdict, was not the action sought by defendant's motion. The action taken by the court was in response to plaintiff's motion, and it is that action that the defendant is now complaining of.

There is but one question before the court. Was it error to permit plaintiff to dismiss her action "without prejudice"?

■ The United States Circuit Court for the Eighth Circuit in the case of Spies v. Union Pacific R. Co., 250 F. 434, loc. cit. 435, makes the following comment on the subject now before this court: "It is too late for a plaintiff to dismiss or to move to dismiss his case without prejudice to a subsequent action for the same cause, after a motion for a directed verdict has been made and submitted, or after such a motion has been made and argued, and the court has expressed its opinion upon it."

The United States District Court for the Western Division of Missouri, in the case of McCann v. Bentley Stores Corp., D.C. Mo., 34 F.Supp. 234, commenting on a situation when the dismissal was sought before trial, stated: "I consider that paragraph (2) of Rule 41(a) is one of the most valuable improvements over the old law accomplished by the new rules. Before the effective date of that rule it not infrequently happened (it was permissible under Missouri laws) that in a case either removed or originally brought here, which had come to issue, perhaps after disposition of preliminary motions, which had gone to trial, in the trial of which plaintiff had introduced all his testimony, for the trial of which defendant had called witnesses from

---

[2] Lemmon v. Continental Casualty Co., Mo.Sup., 169 S.W.2d 920;

[3] Edwards v. Business Men's Assur. Co., Mo.Sup., 168 S.W.2d 82.

[4] See also Associated Mfrs. Corp. v. De Jong, 8 Cir., 64 F.2d 64, loc.cit. 68.

great distances and incurred great expense, the plaintiff would dismiss, just at the moment the court was about to direct a verdict for defendant. The next day he might bring the same suit again. And the process might be repeated time after time. It was an outrageous imposition not only on the defendant but also on the court. Rule 41 has done much to put an end to that evil." [5]

Additional quotations will serve no purpose. There have been many cases decided before and since the promulgation of the Federal Rules of Civil Procedure in line with the decisions quoted from.[6]

In the case of Francisco v. Chicago & Alton Ry. Co., 149 F. 354, 9 Ann.Cas. 628, the United States Circuit Court for the Eighth Circuit approved and quoted opinion in the case of Parks v. Southern Ry. Co., 4 Cir., 143 F. 276, loc. cit. 279. The Parks case lays down a rule which we believe is binding and should be followed by the court in this case: "From the time of the submission of the motion to instruct a verdict the granting of a nonsuit lies wholly in the discretion of the court; and if the court should be of the opinion that the plaintiff for any reason *has been deprived of a right to submit all the evidence on which he relied, or anything should occur during the trial in the nature of a surprise to the plaintiff,* there should be a liberal exercise of this discretion in his favor. In this case no evidence was introduced by the defendant, and it is *not intimated that the plaintiff had any further evidence which would tend in the slightest degree to strengthen the case as presented to the court below.* We are therefore unable to see that any good purpose could have been served by allowing the plaintiff to take a nonsuit." Italics added.

In the case at bar there has been no claim made by plaintiff up to the present time that she was deprived "of a right to submit all the evidence on which she relied". Plaintiff has made no claim of "surprise" occurring during the trial. It has not been intimated that "the plaintiff had any further evidence which would tend in the slightest degree to strengthen the case as presented." When the order now complained of was

made, plaintiff's counsel was asked whether on a re-trial additional evidence could be furnished. With commendable candor plaintiff's counsel stated that he did not at that time know of any additional evidence aside from cumulative testimony of the same kind as had been presented. During oral argument on the present motion plaintiff's counsel made the observation that on a re-trial of the cause Dr. Diehr probably would testify to a hypothetical question that insured was of unsound mind at the time he took his life. Even if this were true, this testimony would simply corroborate the testimony of Dr. Barnes, which was based on all the facts offered in evidence and in the court's opinion would add nothing to the case as made by plaintiff. Plaintiff has filed a brief on the motion now under consideration and some four weeks have passed since the trial of the case. No claim has been made by plaintiff of additional testimony that would permit plaintiff to go to the jury on substantial evidence that insured was insane at the time he took his life.

Under the circumstances thus presented the duty of the court appears plain. We quote from the Parks case (loc. cit. 279 of 143 F.): "It is highly important that the court in the exercise of its discretion should not only see that equal and exact justice is done between litigants, but it is equally important that needless litigation should be speedily determined, and in the trial of cases the court should consider the rights of the defendant as well as those of the plaintiff, and where it appears that all the evidence which it is possible to obtain has been offered and the case has been submitted to the jury or to the court it is the duty of the court, if in its opinion the evidence is not sufficient to justify a verdict in favor of the plaintiff, to direct the jury to return a verdict in favor of the defendant. The courts are not organized for the purpose of permitting the plaintiff in an action to experiment with a certain state of facts for the purpose of ascertaining the opinion of the court as to the law applicable to the same and then permit him to withdraw from the scene of conflict and state a new cause of action and mend his licks in another direction. Such a policy, if adopted, would be

---

5 See Hawkinson Co. v. Goodman, 32 F.Supp. 732, loc.cit. 734.

6 E. Fredericks, Inc., v. Eugene, 2 Cir., 3 F.2d 543; Chicago Title & Trust Co. v. County of Cook, 279 Ill.App. 462; Henjes v. Aetna Ins. Co., D.C.N.Y., 39 F.Supp. 418; Wall v. Connecticut Mutual Life Ins. Co., D.C.Ga., 2 F.R.D. 244; Colonial Oil Co. v. American Oil Co., D.C.S.C., 3 F.R.D. 29; Yarn v. Ft. Dodge, D. M. & S. R. Co., 8 Cir., 31 F.2d 717.

productive of much mischief, and should not be tolerated."

This case was well tried by able and distinguished lawyers. We believe if plaintiff is not satisfied as to the correctness of the court's ruling that there was no substantial evidence upon which her case could be submitted to the jury, the proper procedure is to submit the trial court's action to an Appellate Court for review, rather than proceeding with a re-trial in some other court. Such procedure will determine plaintiff's right to submit to a jury the question of liability on the insurance policy in suit.

This court is of the opinion that the dismissal of this cause "without prejudice" does not conform to the rulings of the United States Court of Appeals for the Eighth Circuit and that the following action will.

### Order

That the order heretofore entered on November 24, 1943, dismissing this cause without prejudice is set aside and said cause is dismissed with prejudice at plaintiff's cost. Plaintiff is allowed an exception to this ruling.