176 So.2d 523 (1965)
David COOK, a minor, by his mother and next friend, Alean Cook, and Alean Cook, individually, Appellants,
v.
Phillip O. LICHTBLAU and Thomas E. Daly, Appellees.
No. 4515.
District Court of Appeal of Florida. Second District.
May 28, 1965.
Rehearing Denied July 20, 1965.
*524 Rupert Jasen Smith, Fort Pierce, for appellants.
Fowler, White, Gillen, Humkey & Trenam, Miami, for appellees.
SMITH, Chief Judge.
The plaintiffs appeal an order dismissing with prejudice their action seeking damages for alleged medical malpractice. We previously reversed a summary final judgment for the defendant-doctors because the affidavit of a Miami physician raised a genuine issue of material fact on the issue of negligence. Cook v. Lichtblau, Fla.App. 1962, 144 So.2d 312. Although subpoenaed by the plaintiffs, the Miami physician did not appear at the trial and the court sustained objections to the introduction of his deposition in evidence. After the plaintiffs had rested and the court had indicated an intention to grant the defendants' motion for a directed verdict, the plaintiffs *525 requested leave "to take a nonsuit without prejudice." The court reserved ruling on this motion, dismissed the jury and subsequently dismissed the cause with prejudice. On this appeal plaintiffs contend that the court erred in excluding the deposition from evidence, in denying the motion "to take a nonsuit without prejudice," and in indicating an intention of granting a directed verdict. We affirm the court's ruling excluding the deposition from evidence but reverse for error in treating the plaintiffs' motion for nonsuit as constituting a dismissal with prejudice.
The minor plaintiff sustained an unusual type of fracture dislocation of the arm on Sunday, February 7, 1960. His family physician unsuccessfully attempted to treat it under general anesthesia administered in a local hospital at Ft. Pierce. He then referred the plaintiff by telephone to the defendant, Dr. Lichtblau, an orthopedic surgeon in West Palm Beach. Dr. Lichtblau engaged the services of the defendant, Dr. Daly, an anesthetist, and arranged to meet the plaintiff and his mother at St. Mary's Hospital in West Palm Beach. When the plaintiffs arrived, various tests were administered and a history was taken which indicated that the minor plaintiff had not eaten since about noon. Dr. Lichtblau found that an emergency existed because the plaintiff was in danger of losing his arm due to impoverished circulation. Dr. Daly considered using a procedure involving local anesthesia but chose general anesthesia instead because the plaintiff was too anxious and apprehensive to be cooperative while conscious.
A closed reduction was first attempted without success apparently under general anesthesia which began at about 8:40 P.M. Open reduction involving surgery was then undertaken and was completed about 10:00 P.M. The surgery itself was uneventful but the plaintiff vomited profusely while recovering from the effects of the anesthesia. Despite certain emergency procedures employed by Dr. Daly, including mouth to mouth resuscitation, aspiration of vomit occurred necessitating a call to a specialist to perform a bronchoscopy. This entailed the administration of additional anesthesia and the plaintiff was not removed to his hospital room until approximately midnight. The operation on the plaintiff's arm proved to be entirely successful but afterwards it was found that he had sustained serious brain damage resulting in permanent disability.
As disclosed in his deposition, Dr. Lichtblau initially had the impression that the plaintiff was showing some effects of anoxia or lack of oxygen since there were definite cerebral changes. At first he thought that the plaintiff might have had a period of anoxia in connection with the aspiration of vomit. However, after further study Dr. Lichtblau concluded that a fat embolism, which, he stated, is unpredictable and cannot be treated, was a more likely cause. He did so, among other reasons, because, in his words, "it was a very short period if [the plaintiff] had true anoxia or true apnea, it was a short period."
In opposing the defendants' motion for summary judgment the plaintiffs submitted the affidavit of a Miami physician which is printed in full in our prior opinion reported at 144 So.2d 312. This alleged in substance a failure to follow approved medical practices, chiefly by administering anesthesia without treating an allegedly underlying condition of "acidosis." Following our reversal the defendants took this physician's deposition pursuant to a notice which stated that it was being taken "for the purpose of discovery under the applicable statutes and Rules of Court." The plaintiffs gave no prior notice that they would seek to use this deposition as evidence and the defendants' attorney limited his questioning chiefly to direct examination.
Thereafter, the plaintiff was examined by a specialist in neurological surgery from Ft. Lauderdale, who had been appointed by the court on motion of the defendants. A *526 report of this doctor's neurological evaluation indicated that anoxia to the brain was a more likely cause of the plaintiff's injuries than fat embolism, that it takes only a few minutes of anoxia to produce such injuries, and that this anoxia "may be from the heart stopping, as we often times see in cardiac arrests, or from obstruction of the respiratory tree or even from nitrous oxide anesthesia as described by C.B. Courville in Medicine, Volume XV, page 129, 1936."
The plaintiffs first received a copy of this neurological evaluation on Thursday, July 11, 1963, four days prior to the trial scheduled to be held on Monday, July 15th. Upon learning that it would be impossible to subpoena this physician because he was in Mexico, the plaintiffs promptly moved for a continuance. At a hearing held on Friday, July 12th, the parties stipulated that this physician's report could be read in evidence upon being advised by the court that it would be "fair and reasonable" to proceed with the trial as scheduled upon this condition. Late Friday afternoon, following this hearing, the plaintiffs' attorney was advised that the Miami physician, who had been served with a subpoena that day, "was not supposed to come." On Saturday he received an affidavit of a Coral Gables specialist in cardiovascular diseases which stated that the Miami physician was his patient and that it would be detrimental for him to appear and testify in court because of certain described ailments, none of which were alleged to be of recent origin.
The plaintiffs' attorneys proceeded with the trial on Monday under the impression that the Miami physician's deposition would be admissible in evidence under the following language of Florida R.C.P. 1.21 (d), 30 F.S.A.:
"At the trial * * * any part or all of a deposition, so far as admissible under the rules of evidence, may be used against any party who was present or represented at the taking of the deposition or who had due notice thereof, in accordance with any one of the following provisions:
* * * * * *
"(3) The deposition of a witness, whether or not a party, may be used by any party for any purpose if the court finds * * * 3, that the witness is unable to attend or testify because of age, sickness, infirmity, or imprisonment; or 4, that the party offering the deposition has been unable to procure the attendance of the witness * * *."[1]
In sustaining the defendants' objections to this deposition the trial judge stated that, if the plaintiffs' attorneys had notified him of the affidavit before the trial began, he could have sought to arrange for the doctor's appearance or granted a continuance; further the court stated that he was not personally acquainted with the attorney who procured the affidavit and that the Coral Gables affiant was not present for cross examination. Upon request the court indicated a willingness to permit the plaintiffs to take another deposition of the Miami physician that evening, but he declined to direct the defendants' attorneys to participate in such a proceeding.
The defendants contend that a deposition taken under Florida R.C.P. 1.21 for the express purpose of discovery only is not subject to use as evidence under any circumstances. We do not reach or *527 pass upon this contention except to note that such authorities as we have found seem to reach a contrary conclusion on this point.[2] However, in Florida another consideration is relevant, namely, the availability of a special procedure or method for introducing the testimony of an expert by deposition. Section 90.23, Fla.Stats., F.S.A., recently adopted by amendment as Florida R.C.P. 1.32. A party seeking to offer an expert's testimony by deposition under this procedure must give prior written notice of such intention to his opponent, who may then seek an order disallowing the taking on the ground that the personal appearance of the witness is necessary to insure a fair and impartial trial.[3] Where, as here, a party knows in advance of trial that his expert will not be available, he should make timely application to invoke this special procedure instead of relying upon a deposition taken by his adversary solely for the purpose of discovery. To hold otherwise would result in depriving his opponent of the benefit of cross examination even though a procedure and opportunity still existed whereby that valuable right could be preserved. For this and other reasons given by the trial judge we find no error in his ruling excluding the Miami physician's deposition from evidence.[4]
Without the benefit of the Miami physician's testimony the plaintiffs failed to prove a prima facie case of malpractice based upon a failure to follow approved medical practices.[5] However, the record did not establish that the plaintiffs could not make out such a case by testimony in admissible form of the Miami physician or another physician. On the contrary the testimony of Dr. Daly, who was called as an adverse witness, tended to confirm, in part, the theory of the plaintiffs' complaint, based on the malpractice charges contained in the Miami physician's affidavit.[6]
*528 Further, at the trial the defendants each testified that no cardiac failure had occurred. Dr. Daly also testified, in substance, that his use of oxygen in conjunction with nitrous oxide eliminated that agent as a possible cause of the plaintiff's injuries.[7] Both defendants testified that the plaintiff's respiratory tree had become obstructed by vomit. This testimony in conjunction with the report of the Ft. Lauderdale neurological surgeon and Dr. Lichtblau's initial impression tended to focus attention upon the aspiration of vomit as a possible cause or contributing cause[8] of the plaintiff's injuries.
Finally, there was new evidence at the trial with respect to the vomiting incident which indicated that the plaintiffs might possibly be able to establish a prima facie case of medical malpractice based upon the careless or unskillful administration of an approved medical procedure in accordance with the principles set forth in Atkins v. Humes, Fla. 1959, 110 So.2d 663, 81 A.L.R. 2d 590.[9]
In this connection Dr. Daly for the first time indicated some uncertainty as to how long respiration actually had been obstructed by vomit,[10] and Dr. Lichtblau testified that in 18 years of practice he had never personally experienced the situation of having a patient injured from anoxia.[11] *529 Further, Dr. Daly testified that vomiting following general anesthesia is very common, that this possibility is always present and that an anesthetist is always looking for it. He also testified that he agreed with the following statement from an authoritative text:
"* * * The only recourse the anesthetist has to prevent aspiration when vomiting occurs is to tilt down the patient in a steep head-down position, and rely upon the well functioning suction apparatus to remove the vomitus. * * *"
Finally, Dr. Daly seemed to indicate that the success of this approved procedure depended in some measure on having a suction machine or apparatus readily available.[12] However, his testimony in this and in another connection,[13] as well as the testimony of Dr. Lichtblau,[14] suggested the *530 possibility that a suction machine may not have been readily available in this case.[15]
The evidence on this phase of the case presumably was prompted by the report of the Ft. Lauderdale physician. Most of it was developed for the first time at the trial and some of it was both new and surprising.[16] Here again, the testimony did not establish that the plaintiffs could not make out a case of malpractice based upon negligence or carelessness in the administration of an approved medical procedure. On the contrary, it indicated that further investigation might possibly develop a basis for asserting such a claim upon amended pleadings.
The plaintiff's motion for leave "to take a nonsuit without prejudice" was prompted by an indication that the court was about to grant the motion for directed verdict which the defendant had made at the close of the plaintiffs' case in chief. The record reflects uncertainty on the part of the trial court concerning the matter of nonsuit which is understandable in view of the contrary views which have been expressed concerning the purpose and effect of the 1962 amendments to Rule 1.35 of the Florida Rules of Civil Procedure.[17] At the trial the defendants did not object to the plaintiffs taking a nonsuit or a dismissal without prejudice nor did they request that terms or conditions be imposed if the motion was granted. Further, they made no motion for dismissal with prejudice. The court initially indicated an inclination to hold that the plaintiffs were entitled to a nonsuit without prejudice but reserved ruling on the plaintiffs' motion and discharged the jury without ruling upon or expressly reserving ruling on the defendants' motion for directed verdict. Following argument the court entered an order of dismissal with prejudice which was expressly predicated upon the assumption that "under Rule 1.35(b) a nonsuit * * * is tantamount to a dismissal with prejudice. * * *" The order also expressed the opinion that "the granting of a dismissal without prejudice on [a] defendant's motion for a directed verdict [would be] an abuse of discretion where the plaintiff did not establish a submissible case." For this proposition the order cited Safeway Stores v. Fannan, 9 Cir.1962, 308 F.2d 94, which involved a dismissal on the court's own motion for failure of a plaintiff's proofs. See 5 Moore's Federal Practice, Par. 41.14, note 11.
The appellants' contention that they were entitled to take a nonsuit as a matter of right cannot be sustained. Rule 1.35 of the Florida Rules of Civil Procedure, as amended, is based on former Florida Common Law Rule 35, which in turn was derived from Rule 41 of the Federal Rules of Civil Procedure. One object of Federal R.C.P. 41 was to do away with the practice prevalent in many states of permitting plaintiffs to take voluntary nonsuits as a matter of right at advanced stages in litigation and to put control of the matter in the hands of the trial judge. Ockert v. Union Barge Line Corp., 3 Cir.1951, 190 F.2d 303, 304. This object was accomplished by inserting in paragraph (2) of subdivision (a) of Federal *531 R.C.P. 41, governing voluntary dismissals, the following sentence:
"Except as provided in paragraph (1) of this subdivision of this rule, an action shall not be dismissed at the plaintiff's instance save upon order of the court and upon such terms and conditions as the court deems proper."[18]
Provision for involuntary or compulsory nonsuit  dismissal on a defendant's motion made at the close of a plaintiff's case, was made by including the following sentence in subdivision (b) of Federal R.C.P. 41, governing involuntary dismissal:
"After the plaintiff has completed the presentation of his evidence, the defendant, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief."[19]
Dismissals not expressly provided for in Rule 41, e.g., a dismissal by the court on its own motion for failure of a plaintiff's proofs,[20] were taken care of by the following sentence in Federal R.C.P. 41(b):
"Unless the court in its order for dismissal otherwise specifies, a dismissal under this subdivision and any dismissal not provided for in this rule, other than a dismissal for lack of jurisdiction or for improper venue, operates as an adjudication upon the merits." (Emphasis added.)[21]
In adopting Florida Common Law Rule 35 the Supreme Court left unchanged the above quoted sentences of Federal R.C.P. 41 which were designed, respectively, to abolish voluntary nonsuits and to sanction involuntary or compulsory nonsuits on motion of defendants. However, it added to the seemingly unrelated sentence concerning dismissals not expressly provided for in the subdivision governing involuntary dismissals the following qualification:
"[E]xcept, however, that nothing stated herein shall preclude a non-suit from being taken pursuant to any applicable statute."
The purpose and effect of this exception was described as follows in Crews v. Woods, Fla. 1952, 59 So.2d 526:
"Rule 35 of the new Florida Common Law Rules deals with the dismissal of actions and is identical with Rule 41 of the Federal Rules of Civil Procedure, 28 U.S.C.A., except that in Section (b) of Rule 35  which section is entitled `Involuntary Dismissal; Effect Thereof'  there is appended the following clause: `except, however, that nothing stated herein shall preclude a non-suit from being taken pursuant to any applicable statute.' Appellants contend that they are entitled to a non-suit as a matter of right under this provision of Section 35(b). This contention cannot be sustained.
"Our `non-suit' statute, Section 54.09, Florida Statutes, F.S.A. provides that `No plaintiff shall take a non-suit on trial unless he do so before the jury retire from the bar.' Under this statute, it has long been the established rule in this state that a plaintiff was entitled, as of right, to take not only a voluntary non-suit but also a compulsory or `involuntary' non-suit, that is, one which `is prompted by an adverse ruling of the court which is preclusive of a recovery *532 by the plaintiff * * * or impedes the proper presentation of plaintiff's cause of action.' Hartquist v. Tamiami Trail Tours, 139 Fla. 328, 190 So. 533, 540. See also Pitt v. Abrams, 103 Fla. 1022, 139 So. 152, and Haile v. Mason Hotel & Investment Co., 71 Fla. 469, 71 So. 540. It should be noted that the right to appeal from such an `involuntary' non-suit has been expressly granted by statute, Section 59.05, Florida Statutes, which as amended by Chapter 22854, Laws of Florida, Acts of 1945, F.S.A., provides that `When, because of any decision or ruling of the court on the trial of a cause, it becomes necessary for the plaintiff to suffer a nonsuit, he may appeal therefrom, and the facts, points, rulings, and decisions may be preserved for review, by the appellate court, as in other cases.'
"Thus, it is a common practice in this state for the plaintiff to take a non-suit when, at the close of his case, the court announces its intention to direct a verdict for defendant because of the failure of plaintiff's proof, and to obtain a review of the sufficiency of his evidence by appeal to this court; and in appending the above-quoted clause to Section 35(b) it was intended only to preserve to a plaintiff the privileges respecting `involuntary' non-suits under these and similar circumstances, as developed in the previous decisions of this court."
Florida Common Law Rule 35 was then adopted as Rule 1.35 of the 1954 Florida Rules of Civil Procedure. Thereafter, in the 1962 revision of the rules the Supreme Court, among other things, deleted the above exception as well as the phrase "and any dismissal not provided for in this rule." However, the court left unchanged the following reference to nonsuits in Florida R.C.P. 2.6(c), 31 F.S.A.:
"In order to entitle the party against whom such ruling is made to have the same reviewed by the appellate court, it shall not be necessary to object or except to any order granting or denying * * * non-suits * * *."
Upon the basis, among others, of the following considerations it might reasonably be argued that the Supreme Court intended to have both forms of nonsuit according to traditional Florida practice continue to exist alongside amended Florida R.C.P. 1.35, governing dismissals: (1) While having much the same effect, a nonsuit and a dismissal without prejudice may readily be distinguished on historical and terminological grounds; (2) The only reference to non-suits was inserted in the subdivision of the rule dealing with involuntary dismissal; (3) By causing the nonsuit exception or qualification to modify the phrase "and any dismissal not provided for in this rule" the Supreme Court may have intended to emphasize the fact that nothing in either subdivision of the dismissal rule should be interpreted as affecting or modifying existing nonsuit practice; and (4) In deleting the exception as well as the "not provided for" phrase the Supreme Court merely selected what seemed to it to be a better method of manifesting this intention.
Further, on the basis of the following considerations, it might less reasonably be argued that the Supreme Court intended to abolish voluntary nonsuits not prompted by adverse rulings but to preserve "involuntary" nonsuits prompted by adverse rulings which preclude recovery or impede the presentation of a plaintiff's case: (1) the privilege of a plaintiff taking a voluntary nonsuit as a matter of right is inconsistent with the provisions concerning voluntary dismissal in Florida R.C.P. 1.35(a), but the privilege of a plaintiff taking an "involuntary nonsuit" as a matter of right is consistent with all of the provisions of subdivision (b), governing involuntary dismissal, except the originally included "not provided for" phrase; (2) In Crews v. Woods, supra, the Supreme Court seems to have indicated that the exception was intended to preserve the prior Florida practice of plaintiffs taking "involuntary" non-suits; (3) By deleting the "not provided *533 for" phrase the Supreme Court eliminated any need for an exception expressly preserving the prior "involuntary" nonsuit practice.
We reject both arguments and hold that under Florida R.C.P. 1.35, as amended, a plaintiff may not terminate an action as a matter of right by taking a nonsuit whether voluntary or involuntary under prior Florida practice. We think the Supreme Court originally recognized that both types of nonsuit constitute, in effect, dismissals at the instance of plaintiffs which could not be permitted to be taken as a matter of right consistent with the provisions of Florida Common Law Rule 35 and Florida R.C.P. 1.35(a).[22] Further, we do not attach great significance to the fact that the exception was added to subdivision (b), nor to the fact that it followed the "not provided for" phrase. We think the exception was inserted for the purpose of temporarily preserving non-suits of both types and that it was subsequently deleted for the purpose of abolishing both types. Assuming arguendo that the Supreme Court initially sought to preserve the "involuntary" type of nonsuit, the effect of the 1962 revision was to abolish that type of nonsuit too. While the purpose in deleting the "not provided for" phrase is not entirely clear, we think the purpose may well have been to indicate that, until the new practice is thoroughly understood, erroneously taken or erroneously allowed nonsuits should be construed as ineffectual attempts to terminate actions or as dismissals without prejudice, rather than as adverse adjudications on the merits, i.e., dismissals with prejudice. Our conclusion is fortified, among others, by the following considerations: (1) The limitation upon the right of plaintiffs to terminate actions contained in Florida R.C.P. 1.35(a), as amended, cannot reasonably be enforced so long as the practice exists of plaintiffs taking nonsuits as a matter of right, whether voluntary or "involuntary;" (2) A rule prohibiting voluntary nonsuits as a matter of right but permitting "involuntary" non-suits as a matter of right also could not reasonably be enforced; (3) The statutory practice of permitting plaintiffs to appeal nonsuits for the purpose of obtaining appellate review of adverse rulings was anomalous in that it authorized, in effect, advisory opinions upon interlocutory appeals; (4) The advantages to plaintiffs from both types of prior nonsuit practice are slight compared to the disadvantages to defendants, parties, witnesses and courts which are inherent in the practice; and (5) The rights of plaintiffs can be adequately protected by proper application of the dismissal procedure.
The alternate holdings of the trial court also cannot be sustained. From the fact that nonsuits have been abolished it does not necessarily follow: (1) that a motion for leave to take a "nonsuit without prejudice" is "tantamount to a dismissal with prejudice," (2) that a plaintiff's motion for voluntary dismissal after he has rested and the defendant has moved for a directed verdict necessarily comes too late, or (3) that it would be an abuse of discretion to grant a voluntary dismissal at that late stage merely because the plaintiff had not established "a submissible case." Rule 1.35(a) of the Florida Rules of Civil Procedure expresses no such limitations upon the discretion of the trial judge in passing on a motion for voluntary dismissal. Further, the leading federal decisions interpreting identical language in Federal R.C.P. 41 (a) expressly recognize the propriety of allowing such a dismissal, even at that late stage, where there was a "technical failure of proof [and] there is nevertheless a meritorious claim," the latter a ground for voluntary dismissal in the Report of Proposed Amendments to Rules of Civil Procedure *534 (1946) 64.[23] The plaintiffs here obviously were handicapped by the unavailability of the Miami and Ft. Lauderdale physicians. With hindsight their attorney may be criticized for having failed to press more vigorously for a continuance on Friday or for having failed to renew his motion for continuance on Monday. However, in the absence of any prior rulings directly on these points we cannot say he was wholly unreasonable in assuming (1) that the Miami physician's deposition might be admissible,[24] (2) that he might be entitled to take a nonsuit as a matter of right in any event, if his proofs failed or appeared to be insufficient;[25] or (3) that the court might exercise its discretion to grant him a voluntary dismissal without prejudice under such circumstances, if it considered nonsuits abolished.[26] Finally, there was new evidence at the trial which furnished a possible basis of recovery upon theories entirely different from that pleaded in the amended complaint and much of this necessarily came as a surprise, since the inferences from it were contrary to those which could reasonably have been drawn from the prior testimony on depositions.
As indicated above the deletion of the "not provided for" phrase in 1962 seems to us an indication that erroneously sought nonsuits should not be treated as dismissals with prejudice but as motions for dismissal without prejudice. That deletion also raises doubt in our minds concerning the propriety of a Florida court dismissing an action with prejudice on its own motion for insufficiency of proof. Assuming arguendo that such power is inherent, for the reasons stated above, the trial court obviously should not have exercised the power in this case.[27]
The appellants seek to have us, in effect, review the sufficiency of the evidence by arguing that the trial court erred in indicating an intention of granting the defendants' motion for directed verdict. Further, in a brief filed in this court shortly before the four-year statute of limitations ordinarily would have run, they request us to "vacate" the order of dismissal and either grant a new trial, or, in the alternative, "enter an order allowing [them] a nonsuit with instructions to allow [them] to refile their cause of action, inasmuch as the statute of limitations had not run against [them] at the time the motion for nonsuit *535 was made." In failing to institute a second action before the statute ran, the appellants presumably relied upon prior decisions indicating that they could obtain a reversal on the ground that they were entitled to take a nonsuit as a matter of right,[28] and, if successful on a subsequent statutory appeal from a nonsuit entered on our mandate, have the action reinstated on the docket.[29] Since the statutory nonsuit appeal procedure has been abolished, a mandate from this court which merely reversed the involuntary dismissal and directed the trial court to exercise its discretion upon the plaintiffs' motion, treated as a motion for voluntary dismissal, might result, in the plaintiffs' being barred by the statute of limitations.[30] On the other hand, we doubt that this court has power or authority to interfere with the ordinary operation of a statute of limitations by entering an order purportedly authorizing a litigant to institute a second action. In view of all the circumstances of this case we conclude that a mistrial should be declared. The basis for a mistrial is found in the action of the trial court dismissing the jury. By dismissing the jury before he exercised his discretion upon what, in legal effect, constituted a motion for dismissal without prejudice, the trial judge effectively foreclosed any possibility of exercising his discretion against granting that motion. By the same action he precluded the possibility of denying the defendants' motion for a directed verdict, upon which he did not expressly reserve ruling. Under the circumstances we think the trial court should preserve the pending action by declaring a mistrial. For the foregoing reasons and because different or additional evidence may be submitted in this or another action, we decline to pass upon the sufficiency of the plaintiffs' evidence at this time.
Reversed and remanded for further proceedings not inconsistent with this opinion.
ANDREWS, J., and KELLY, CLIFTON M., Associate Judge, concur.
NOTES
[1] Subsection 5 of Rule 1.21(d) (3) further provides that a deposition may be so used, if the court finds "upon application and notice, that such exceptional circumstances exist as to make it desirable in the interest of justice and with due regard to the importance of presenting the testimony of witnesses orally in open court, to allow the deposition to be used."
[2] Rosenthal v. Peoples Cab Company, D.C.W.D.Pa. 1960, 26 F.R.D. 116; Re-Trac Corp. v. J.W. Speaker Corp., D.C.E.D. Wis. 1962, 212 F. Supp. 164, 165; 4 Moore's Federal Practice, Par. 26.04. Cf. Vevelstad v. Flynn, 9 Cir.1956, 230 F.2d 695.
[3] Owea v. Zemzicki, Fla.App. 1962, 137 So.2d 876.
[4] Since the Miami physician was an expert witness, his duty to attend court and testify with respect to matters of opinion and the correlative power of the court to compel him to do so are the subject of some doubt, concerning which we express no opinion. Annot., Compelling expert to testify, 77 A.L.R.2d 1182 (1961).
[5] Actually, it is not clear that the deposition would have established a prima facie case in any event. The physician had been examined chiefly with respect to his prior affidavit, set forth in full at 144 So.2d 312, 313, which contained sufficient averments of negligence to preclude the granting of summary judgment for the defendants. However, the affidavit was not attached to or made part of the deposition and the oral examination did not cover the following essential allegations set forth in the second, third and fourth paragraphs of the affidavit:

"`That it is well known medically and to him that "acidosis" from any cause is a contraindication for giving anesthesia. * * * that it was not in accordance with the usual judgment, skill and care ordinarily required for the practice of medicine on the part of a surgeon and anesthetist to have given anesthesia to David Cook under these circumstances and without treatment of the pre-existing "acidosis," i.e., was not what a reasonable and prudent physician would do and that this is negligence in any community in this country, including West Palm Beach. * * *
"`It should be further noted that there was apparently no attempt made prior to the operation or directly thereafter to combat this condition of "acidosis" by the giving of insulin or intravenous fluids, and also that there is no record of any blood pressure recordings. * * *
"`That all of the foregoing in the last paragraph was not in accordance with the usual judgment, skill and care ordinarily required in the practice of medicine.' * * *"
[6] While Dr. Daly denied that the presence of acetone in the plaintiff's urine "necessarily" indicated a condition of acidosis, he testified that one or two ether anesthesias had been administered at Ft. Pierce, that ether anesthesia can cause acetone in the urine, that the presence of acetone "can be" a danger sign, and that a condition of acidosis would be a "contraindication" to the administration of ether "under some circumstances."
[7] Dr. Daly testified that he employed an intravenous agent followed by a combination of nitrous oxide, oxygen and ether.
[8] In his affidavit the Miami physician had stated: "That it is further well known that oxygen lack due to asphyxia, from any cause, is accompanied by retention of CO[2] which further increases `acidosis.'"
[9] The cited case enunciated the following principles:

(1) In cases involving negligence based on the careless or unskillful administration of an approved medical treatment, as distinguished from an incorrect diagnosis or the adoption of the wrong method of treatment, a jury may be capable of reaching a conclusion despite the absence of expert testimony that the acts complained of amounted to bad medical practice;
(2) Even in those cases where some expert testimony may be required to show causation, a jury may be authorized to infer from the circumstances that the defendant was negligent in the administration of an approved medical treatment, despite the absence of direct expert testimony to this effect and in the face of expert testimony to the contrary;
(3) Since malpractice is hard to prove and the physician has all the advantage of position, what might be slight evidence when there is no such advantage, as in ordinary negligence cases, takes on greater weight in malpractice suits;
(4) The foregoing principles are particularly applicable in cases involving negligence in carrying out an approved medical procedure which is designed to prevent the very condition of which the patient complains.
[10] Did he have an obstruction of the respiratory or bronchial tree?
"A For a very short period of time.
"Q For a few minutes?
"A For a few seconds.
"Q Just for a few seconds he had an obstruction to the bronchi or to the respiratory tree, only a few seconds?
"A Probably, I am not certain, but probably."
[11] Neither physician was asked by either counsel whether aspiration of vomit or anoxia from aspiration of vomit sometimes occurs where due care and skill are exercised. Compare Benson v. Dean. 1921, 232 N.Y. 52, 133 N.E. 125, cited in Montgomery v. Stary, Fla. 1955, 84 So.2d 34, 40 and Atkins v. Humes, supra at note 9, 110 So.2d 663. In the Benson case evidence that a surgical needle broke and that the broken portion was left in the wound was held sufficient to place the burden on the defendant of coming forward with proof. When the defendant's expert witnesses testified that surgical needles sometimes break and escape detection even when the utmost care is exercised, this evidence, uncontradicted, was held to have eliminated the inference of negligence which otherwise would have been permissible under the rule of res ipsa loquitur.
[12] When asked what procedure an anesthetist followed when a patient vomited in such a situation, Dr. Daly testified somewhat obliquely:

"A Well, let's take a new recovery room  St. Mary's Hospital  at every bedside there is a various suction equipment  not one suction machine for the sixteen beds, but sixteen suction machines.
"Q What are the sixteen suction machines for?
"A To suck the patient if the patient vomits, which happens frequently.
"Q Was this procedure followed by you?
"A It was.
"Q And that is a machine?
"A Right.
"Q As I understand it, before you were able to and did get the machine in use that you cleaned out this child's mouth by hand and used also mouth to mouth resuscitation?
"A I did.
"Q And did you get the tube 
"A During all of this time I was reaching for my instruments. I wasn't wasting one second."
[13] Dr. Daly's account of the actual occurrence and procedures employed is as follows:

"The operation was over and the child, the anesthesia was stopped. The child had a tracheal tube in his windpipe. This is a tube put in the windpipe with a little cuff to make it airtight so that no material can get down the child's windpipe. We usually wait until the child is doing what we call `reacting.' The child isn't totally awake, but the child is getting his reflexes back. We wait for this time because we figure that the child's reflexes would have returned. When he was in this condition I removed the breathing tube. I turned to put this tube on the anesthetic machine. I turned back. The child was vomiting. I tipped the child's head down, which is the proven procedure. I took the vomit out with my hands and then sucked it out. That was all an urgent matter. You do something quickly rather than waste time to grab any instruments. I did mouth to mouth resuscitation on him while I was reaching back to get my instruments. I reinserted the tracheal tube in the windpipe. First of all I sucked the tube out  in his windpipe, sucked the tube out clean, attached him to the gas machine and started giving him more oxygen under pressure. This took about thirty seconds. The reason I sort of hesitated, the idea of vomiting is not too unusual under anesthesia, therefore we watched for it. We are always looking for it to happen."
[14] Dr. Lichtblau's account of the occurrence is as follows:

"Well, I did first the operation, put the dressings on, I started to put the cast on and took the tourniquet off and checked his pulse, and everything seemed to be all right. Dr. Daly felt that he was light enough, took the tube out and then the child vomited up and I recall Dr. Daly took some clean face towels and washed his mouth out as best he could and sucked him out immediately, tilted the table down and sent Miss O'Malley, the circulating nurse, for more, other equipment. He knew he had to put the tube back down. About that time, I kept my hand on the little boy's pulse all the time to make sure his heart didn't stop at any time. I kept the check on that personally, never let it go."
[15] This possibility had not been explored in the depositions and was not further pursued at the trial.
[16] As indicated above in his deposition Dr. Lichtblau had testified: "* * * it was a very short period if [the plaintiff] had true anoxia or true apnea, it was a short period." With respect to the vomiting incident Dr. Lichtblau also had testified on deposition that Dr. Daly "immediately suctioned [the plaintiff] out. * * *" Dr. Daly himself had testified on deposition that he "took it out with his hands and sucked it out with suction;" also, that he "grabbed a suction and sucked some out."
[17] Compare Dobson v. Crews, Fla.App. 1964, 164 So.2d 252 and Florida East Coast Railway Company v. Lewis, Fla. App. 1964, 167 So.2d 104 with the dissenting opinion of White, J., in Thoman v. Ashley, Fla.App. 1964, 170 So.2d 332, 337-339.
[18] 5 Moore's Federal Practice, Par. 41.05[1].
[19] 5 Moore's Federal Practice, Par. 41.13[1]. As originally promulgated this sentence applied to both jury and court cases but as amended in 1963 the sentence is limited to court cases. Ibid.
[20] Safeway Stores v. Fannan, supra. For other examples see 5 Moore's Federal Practice, Par. 41.14 at note 11.
[21] 5 Moore's Federal Practice, Par. 41.14. This sentence was amended in 1963. Ibid.
[22] We recognize that a successful statutory appeal by a plaintiff from an "involuntary" nonsuit left pending the action in which the "involuntary" nonsuit was taken. See note 29 infra.
[23] In the federal courts motions for voluntary dismissal without prejudice after the plaintiff has rested or the defendant has moved for a directed verdict are not favorably regarded and a strong showing is necessary to warrant the entry of a dismissal without prejudice at that late stage. 2B Barron and Holtzoff, Federal Practice and Procedure, § 912 at notes 44.1 and 45; 5 Moore's Federal Practice, Par. 41.05[1] at notes 27 and 28. However, even the federal decisions which affirm the denial or reverse the grant of such motions expressly recognize that the trial court has discretion to grant such a motion even at that late stage in a case such as this. See Yoshio Murakami v. Dulles, 9 Cir.1955, 221 F.2d 588; Ockert v. Union Barge Line Corp., 3 Cir.1951, 190 F.2d 303; International Shoe Co. v. Cool, 8 Cir.1946, 154 F.2d 778; Evans v. Teche Lines, 5 Cir.1940, 112 F.2d 933. See also Boaz v. Mutual Life Ins. Co. of New York, D.C.E.D. Mo. 1943, 53 F. Supp. 97 (aff'd, 8 Cir.1944, 146 F.2d 321).
[24] See, e.g., Owca v. Zemzicki, Fla.App. 1962, 137 So.2d 876.
[25] See e.g., West Coast Fruit Co. v. Hackney, 1929, 98 Fla. 382, 123 So. 758.
[26] Note 23, supra.
[27] Supra at note 23. The Safeway Stores case, supra, relied on by the trial judge, is inapplicable for additional reasons. The plaintiff in that case made no motion for nonsuit or for voluntary dismissal without prejudice. Further, in holding that the trial court had abused its discretion in dismissing without prejudice, rather than with prejudice, the appellate court expressly noted: "Counsel for [the plaintiff] made no suggestion to the court that other evidence might be procured, or that he was surprised (in a legal sense, as distinguished from the usual `surprise' of a losing counsel), or of any other reason why the matter should not have followed the normal course to a judgment on the merits, nor has any such suggestion been made to us." 308 F.2d 94 at p. 99.
[28] West Coast Fruit Company v. Hackney, 1929, 98 Fla. 382, 123 So. 758.
[29] See, West Coast Fruit Co. v. Hackney, 1931, 102 Fla. 1066, 136 So. 699.
[30] See, Schneider v. Cohan, Fla. 1955, 82 So.2d 133; West Coast Fruit Co. v. Hackney, supra at note 29; Vines v. Crescent Transit Co., 1962, 274 Ala. 173, 146 So.2d 318; Annotation: Period within which new action may be commenced after nonsuit or judgment not on merits, 83 A.L.R. 478 (1933), § VI of which has been superseded by Annot., 54 A.L.R.2d 1229 (1957). See also, Doyle v. Wade, 1887, 23 Fla. 90, 1 So. 516; Annotation: Voluntary dismissal or nonsuit within the provisions of statute extending time for new action in case of dismissal or failure of original action otherwise than on merits, 79 A.L.R.2d 1290 (1961).