902 F.Supp. 1007 (1995)
Carrie L. HARRIS, Plaintiff,
v.
GENERAL AMERICAN LIFE INS. CO., INC., Defendant.
No. 4:94CV597 CDP.
United States District Court, E.D. Missouri, Eastern Division.
October 24, 1995.
*1008 Dennis J. Curland, Briegel and Baylard, Chesterfield, MO, for plaintiff.
John G. Enright, Partner, Mary Diane Rychnovsky, Kortenhof and Ely, St. Louis, MO, for defendant.

MEMORANDUM AND ORDER
PERRY, District Judge.
This case arises under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 et seq., and is now before the Court for determination following a non-jury trial.
Plaintiff, Carrie Harris, originally brought this action against defendant, General American Life Insurance Company, in the Circuit Court of the County of St. Charles, alleging a claim of vexatious refusal to pay. Defendant timely removed the case to this Court on the ground that ERISA preempted plaintiff's state-law claim. As a result, plaintiff filed an amended complaint alleging an ERISA claim to recover accidental death insurance benefits allegedly due under an employee welfare benefit plan that covered her husband.
From the evidence adduced at trial, and from the stipulations of the parties, the Court makes the following findings of fact and conclusions of law:

Findings of Fact
Plaintiff's husband, John William Harris, was an employee of the Ambassador Floor Company and a member of the Carpet, Linoleum, Hardwood & Resilient Tile Layers' Local Union 1310. By virtue of his union membership, Mr. Harris was insured under a Group Life Insurance Policy issued by defendant. One of the benefits provided under the policy was accidental death and dismemberment benefits in the amount of $30,000, on which plaintiff was the beneficiary.
On February 28, 1993, following an argument, plaintiff left the Harris' familial home for a few hours. Upon returning that evening, plaintiff discovered that Mr. Harris had sexually molested plaintiff's twelve-year-old daughter, who was also Mr. Harris' adopted daughter. After realizing what had occurred in her absence, plaintiff "stormed [back into the living room]" and she asked Mr. Harris repeatedly "how he could do this [to his daughter]". She told him to immediately *1009 leave the house and she informed him that she was going to call the police. Mr. Harris responded by getting off the couch, saying "I guess I'm out of here," and walking into the bedroom. Plaintiff testified that she assumed he went to pack his bags, but that "seconds" after she began consoling her upset daughter she heard a "pop" come from the bedroom. Mr. Harris had committed suicide with his 9 millimeter semi-automatic pistol.
Plaintiff testified that Mr. Harris became depressed and upset whenever he was laid off work and that in the fall of 1992 to winter of 1993 he was laid off a large percentage of the time. During the time he was laid off from work he drank more than usual. Plaintiff discovered that her husband had been taking valium for chronic back pain around October of 1990; she believed from October of 1992 until the time of his suicide he was never out of valium. The pharmaceutical records presented at trial established that the decedent had valium prescribed in October of 1992, with refills in November, December, January, and February. The testimony established that the quantity of valium prescribed was normal for back pain. Toxicology reports performed after decedent's death showed that at the time of death his blood and urine tested positive for alcohol, valium, and marijuana, although the quantities of those drugs were well below any intoxicating level, either alone or in combination.
Plaintiff had never received mental health treatment. He had threatened suicide previously, approximately a year before his death. He had also had instances of violence where he had assaulted his wife physically on at least two occasions. The day before his suicide he had a physical confrontation where he struck an automobile windshield with a snow shovel and, according to his wife, thereafter became "paranoid" that the police would come and arrest him. Plaintiff and decedent's sister testified to what they perceived as strange behavior, including a fascination with firearms and computers.
Plaintiff presented the testimony of psychiatrist Dr. Ralph Biddy, who opined that, based on his review of the records and his interview with the surviving family members, plaintiff was suffering from long-standing polysubstance abuse and a mood disorder and that he was intoxicated at the time of his death. The Court finds that Dr. Biddy's conclusion of intoxication was based on a misreading of the laboratory results.
Dr. George Murphy, an expert in suicidology presented by the defense, concluded that Mr. Harris was neither intoxicated nor psychotic at the time of his death. Additionally, Dr. Murphy testified that, although individuals suffering from depression tend to commit suicide in response to pressures from within, alcoholics and individuals with substance abuse problems, such as Mr. Harris, tend to commit suicide because of external factors which negatively impact their lives. Dr. Murphy concluded that Mr. Harris' suicide was caused not by insanity, but by the cumulative effect of his impaired social support structures, the threat of his arrest and subsequent imprisonment, his unemployment, and his medical problems.
On or about April 5, 1993, plaintiff filed a claim with defendant for accidental death benefits. On June 8, 1993, after obtaining Mr. Harris' treatment records, as well as the response to a questionnaire sent to Mr. Harris' physician, defendant denied plaintiff's claim. Plaintiff sought review of her claim by defendant on January 31, 1994, and provided defendant with additional materials in support of her claim. On February 7, 1994, plaintiff was informed by letter that defendant had reviewed her claim and had again denied it. In denying plaintiff the policy benefits, defendant determined that plaintiff's husband was sane at the time of his suicide and that, based on Missouri law, suicide while sane is not considered an accident.

Discussion
Because all of the rights sought to be secured by plaintiff in this action relate to an employee benefit plan, and therefore fall under ERISA, this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. As set forth in this Court's August 30, 1995, Memorandum and Order, the denial of benefits in this case is reviewed under a de novo standard.
*1010 Under Missouri law, the taking of one's life while sane is not an accident; however, committing suicide while insane is considered an accident. See, e.g., O'Boyle v. Life Ins. Co., 299 F.Supp. 704, 705 (W.D.Mo. 1969); Miller v. Home Ins. Co., 605 S.W.2d 778, 780 (Mo.1980) (en banc); Skaggs v. Aetna Life Insurance Co., 884 S.W.2d 45, 46 (Mo.Ct.App.1994). Explaining why an insane suicide is considered an "accident", the Missouri Supreme Court reasoned that "an insane suicide is not truly suicide, because an insane intent or insane impulse resulting in the action causing death is no intention at all, and, therefore, death by insane suicide is accidental." Edwards v. Business Men's Assurance Co., 168 S.W.2d 82, 94 (Mo.1942). The burden of proving by a preponderance of the evidence that Mr. Harris killed himself while insane is upon the plaintiff, see Boaz v. Mutual Life Ins. Co., 53 F.Supp. 97, 100 (E.D.Mo.1943), aff'd, Boaz v. Mutual Life Ins. Co., 146 F.2d 321 (8th Cir.1944); Laventhal v. New York Life Ins. Co., 40 F.Supp. 157, 159 (E.D.Mo.1941); Edwards, 168 S.W.2d at 87, and in the Court's judgment plaintiff failed to sustain this burden.
Turning to the central issue of whether Mr. Harris was in fact "insane" when he committed suicide on the evening of February 28, 1993, the Court notes at the outset that "insanity" is a legal, and not a medical, term. See generally Stedman's Medical Dictionary (25th ed., 1990). Not all persons suffering from diagnosable mental diseases or impairments are necessarily "insane" as that term is used in the Missouri suicide cases. Similarly, the competing experts' conclusions regarding decedent's mental state, while helpful, are not determinative of the legal issue presented here. Since insanity is viewed as vitiating the decedent's intent to take his or her own life, Edwards, 168 S.W.2d at 94, the Court must decide "whether [decedent] was capable of knowing the difference between right and wrong at the time of the act," Rubinstein v. New York Life Ins. Co., 153 S.W.2d 760, 765 (Mo.Ct. App.1941), quoted in Lemmon v. Continental Casualty Co., 169 S.W.2d 920, 929 (Mo.1943); see also Garmon v. General American Life Ins. Co., 624 S.W.2d 42, 47 (Mo.Ct.App.1981); Sturm v. Washington Nat. Ins. Co., 208 F.2d 97, 100 (8th Cir.1953), cert. denied, Washington Nat'l Ins. Co. v. Sturm, 347 U.S. 918, 74 S.Ct. 516, 98 L.Ed. 1073, (1954), and whether Mr. Harris was "impelled [to commit suicide] by an insane impulse." Boaz, 53 F.Supp. at 100; see also New York Life Ins. Co. v. King, 93 F.2d 347, 353 (8th Cir.1937) (defining insanity as impairing an individual's "reasoning faculties" to such an extent that "he is not able to understand the moral character, the general nature, consequences, and effect of the act he is about to commit, or when he is impelled thereto by an insane impulse...."); Laventhal, 40 F.Supp. at 159 ("The criterion of insanity ... is whether the insured was so far mentally unsound that he could not exercise a rational judgment upon the question of life and death; whether he was oblivious to the duties which he owed his family, to his friends, and to himself; whether he was impelled by a morbid impulse which he had not sufficient strength of will to resist.").
As tragic as the facts surrounding Mr. Harris' suicide are, they do not show that Mr. Harris did not understand the difference between right and wrong or that he was compelled to commit suicide by an insane impulse. In Boaz, for example, the decedent was suffering from a painful sickness which he believed to be incurable, he felt that this sickness would eventually result in his death, he was worried that he was becoming a burden to his family, he had suffered a business failure, and he was facing possible bankruptcy. 53 F.Supp. at 101. The Boaz Court, in granting a directed verdict, found that the decedent committed suicide while sane and stated that, "[i]f there is ever justification in the judgment of a sane person for taking one's life, the court is impressed that insured came within that class." Id. The instant case is analogous because, like the decedent in Boaz, Mr. Harris was also faced with a series of grave personal problems which, when viewed as a whole, certainly can be described as daunting and which provide a ready explanation for he why chose to take his life  his marriage was surely irretrievably broken after he abused his daughter, he was likely to be arrested by the police for his criminal actions, he was suffering from chronic back pain, and he was *1011 unemployed. This case, however, is even stronger than Boaz, because here Mr. Harris not only was able to understand the difference between right and wrong, but his ability to understand this distinction appears to have been the very factor which drove him towards the decision to take his own life, given that his suicide occurred immediately after plaintiff confronted him and demanded an explanation for why he had sexually abused his twelve-year-old daughter.
It is apparent from the testimony presented at trial that Mr. Harris knew the difference between right and wrong, and that he had the ability to control and understand the consequences of his actions. His act of suicide cannot reasonably be termed an "insane impulse." As Mr. Harris was not insane at the time of his suicide, his death was not an accident, and plaintiff is therefore not entitled to benefits under the accidental death policy.
Accordingly,
IT IS HEREBY ORDERED that defendant General American Life Insurance Company, Inc. shall have judgment against plaintiff Carrie L. Harris on all of plaintiff's claims.